469 So.2d 967 (1985)
Ora D. WATSON, et al.
v.
STATE FARM FIRE AND CASUALTY INSURANCE CO., et al.
No. 84-C-2158.
Supreme Court of Louisiana.
May 24, 1985.
Rehearing Denied June 27, 1985.
*968 Ronald J. Brumfield, Knight & Brumfield, Franklington, for plaintiff-applicant.
Alton B. Lewis, Jr., Pittman, Mathen, Lewis & Moody, Hammond, for defendants-respondents.
CALOGERO, Justice.
A lawsuit was brought by Ora Watson, individually and as tutrix of her minor child, and six major Watson children, against Earl Creel and his insurer, State Farm Fire and Casualty Insurance Co., for the wrongful death of Ora's husband and the children's father, Doyle Watson. The claim arose out of a hunting accident in which Earl Creel's minor son, Shane, shot and killed the fifty-three year old Watson with a high-powered rifle. A trial jury rendered a verdict in favor of defendants, finding decedent Watson 100% at fault in connection with the accident. The First Circuit Court of Appeal, 459 So.2d 1235, affirmed.
We granted writs in this essentially factual dispute because we perceived the Court of Appeal to have applied an inappropriate standard of review. The Court of Appeal found that the jury's verdict was "based upon a reasonable evaluation of credibility," an applied review standard which seemed quite similar to the "reasonable basis for [a trial court's] finding" test which this Court found insufficient in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). In fact the appropriate standard is that a finding of fact by the trial court should be upheld "unless it is clearly wrong," or manifestly erroneous. Furthermore, it just seemed so clearly wrong for the lower courts to have determined that the victim of this accidental shooting by a deer hunter was the only party at fault, especially inasmuch as comparative fault, rather than the bar of contributory negligence, prevailed in the law when the shooting took place.
The accident occurred on the Watson farm in Mt. Hermon, a community located in Washington Parish, in the early evening hours of December 29, 1981.[1] The Creel family had been invited to hunt deer on the Watson property by the victim, Doyle Watson, *969 since deer had been decimating the vegetable garden on Watson's farm.[2] (In fact, each hunter was later positioned on the edge of a field to cover as much of the farm as possible and each was instructed as to the most likely approaches of the deer as they prepared to feed.) After meeting at the farmhouse, the group of hunters traveled on a field road in Earl Creel's truck to the positions pointed out by Mr. Watson. Earl Creel's sixteen year old stepson was dropped off first, then Shane. Shane was placed on a tree stand at the edge of an oval field, which was surrounded by woods. Some bales of hay were located near the tree stand and Shane was offered this location as an alternative should he become too cold in the tree stand. He did move to the bales, and it was from this spot that he later fired the fatal shot. Earl Creel was also placed in a tree stand, out of sight of the boys. Willie Creel drove the truck another 150 yards from Earl and used the truck itself as a stand. Mr. Watson proceeded into the swamp on foot in search of a large buck. He planned to hunt until dark before walking home, and the position of his body on the road, as well as his footprints, indicated that he had in fact been returning home at the time of the accident.
Shane Creel, born October 5, 1969, was just twelve years old and in the seventh grade when he fatally shot Doyle Watson. Although he had owned a "child's model.22" caliber rifle since the age of ten, and had been allowed to shoot since he was nine, Shane had until then merely hunted small game. He had, however, admired his father's Marlin 30-30 rifle,[3] and the gun was presented to him on his twelfth birthday (just twelve weeks before the ill fated deer hunting trip), with the promise that he could now hunt deer with other family members. Because of the high cost of shells for the rifle, $6 to $8 for a box containing twenty shells according to Mr. Creel, Shane lacked experience in firing the rifle. Shane himself testified that he had only twice fired this weapon.[4] Perhaps more significantly, the boy lacked familiarity with the use of the scope attached to the rifle. Earl Creel himself stated, "There is no point in using a rifle if you can't use a scope," and there is no question but that Shane had never sighted a deer in the scope. In fact, Shane testified that he had never seen a live deer, although he had seen a picture of one. On his one deer hunting expedition in the Honey Island Swamp, shortly before this tragic outing, his party had failed to sight a single deer in several days of hunting. However, throughout that trip, Shane's father, Earl, had seated himself back to back with Shane, or was at least within sight of the boy at all times, to assist Shane in the use of the high-powered rifle. And, although Earl Creel had instructed his young son on gun safety, Shane had had no formal instruction of any kind in the use of firearms.
On this occasion, Shane had been alone either on the stand or near the bales for about two hours before he noticed a moving object which, in the light of dusk, he thought was a deer. In recalling its location in the field, the boy's testimony indicated uncertainty, perhaps because the scope altered his perspective. He stated:
It was out in the edge of the woods, I guess, or it could have been in the center of the field.
*970 He also testified that the view was about the same from either on top of the four foot high bales of hay or from the twenty-five foot high tree stand. At any rate, he described an object moving back and forth in front of him and occasionally dropping its head from view, presumably to either eat or drink. He claimed to have followed visually the object's movements through the scope for several minutes, "to be sure what I was shooting at" before firing. In deposition, read at trial, Shane stated, "I kept on studying it for a little while and then I presumed that it was a deer and I fire at it." He proceeded to search for the fallen deer, but without success. He could not find any tracks, much less a deer.
A single shot had been fired, and 461 feet away Doyle Watson sustained a large wound in the right front portion of his head. His death was apparently immediate. Watson was wearing black work boots, a dark baseball cap with a white front displaying an advertisement of some kind, gray work pants, a green-colored camouflaged hunting jacket, and partially visible white insulated underclothing. Although the Creels all wore the "Hunter orange" vests and offered one to Mr. Watson, he declined the offer.[5] Furthermore, although Watson had, himself, placed Shane at the stand, and had directed the boy's attention for hunting to the very area in which he was later shot, he apparently made no effort to call to Shane or otherwise alert the boy to his presence in the same area shortly before the accident. Of course, it is possible that he assumed that the Creels had already left the farm. He had earlier told them not to wait for him, and apparently anticipated that their departure would precede his own.
Plaintiffs' attorney sought to establish the negligence of Earl Creel, Shane's father,[6] on several bases: (1) giving his son Shane a high-powered rifle on the child's twelfth birthday; (2) not properly instructing Shane in the use of that weapon; (3) not adequately supervising Shane at the time of the accident, particularly in failing to show him how to sight game with the rifle's scope. On the other hand, plaintiffs' counsel attempted in his opening statement to the jury to minimize Shane's fault, which he described as "very slight, if any." Counsel for the defense countered that the accident would not have occurred had Mr. Watson worn the "Hunter orange" vest, or signified his presence when he walked in *971 the area which he had personally designated for hunting.
We agree with the lower courts to this extent. Watson was not without fault in this accidental shooting. However, the concept of comparative negligence, written into La.Civ.Code Ann. art. 2323,[7] permits a plaintiff such as Mr. Watson (or his wife and children) to recover damages, notwithstanding his own negligence.
A pure comparative fault system was adopted in Louisiana in 1979 by Act No. 431. That act became effective only on August 1, 1980.[8] It was specifically designed to ameliorate the harshness of the contributory negligence doctrine by apportioning losses between the plaintiff and defendant when both are negligent.[9] This allocation of shares of negligence, however, is not an easy task for the factfinder, and the Louisiana statute does not describe with particularity how it should be accomplished.[10]
Clearly, however, the concept of comparative negligence is not applicable when the victim alone is the party at fault. In this case, the jury in response to interrogatories found that Earl Creel was not at fault in causing the accident, that Shane Creel was not at fault in causing the accident,[11] and *972 that Doyle Watson was at fault. Expressed in terms of a percent, the jury answered that Watson's degree of fault was "100%."
Upon appellate review Louisiana courts have jurisdiction with regard to both law and facts. La.Const. art. V, § 10(B). However, we have held that
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
This standard of appellate review was not intended to be applied so as to require upholding the ruling of a trial court simply, "when the evidence before the trier of fact furnishes a reasonable basis for its finding." Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). Instead, a finding of fact by a trial court should be upheld "unless it is clearly wrong." And "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court." Id. Proper review requires that the appeal court determine from the record that the trial court finding is not clearly wrong or manifestly erroneous.
Here, the jury was clearly wrong, considering all the evidence, in deciding that Earl Creel and his twelve year old son Shane were each without fault in the accidental death of Doyle Watson. It is incomprehensible that no negligence was involved in Earl Creel's arming an untrained twelve year old boy with a high-powered rifle, from which the boy had had occasion to fire previously only two shells, and leaving him alone in the woods to hunt a species of animal which he had never seen. So too, it is incomprehensible that the boy did not share some fault in this tragic accident, for it surely constitutes negligence to fire a rifle at a moving object without ascertaining with certainty that it is not a human being.
The Court of Appeal stated that they were required to uphold the finding of a jury when "based upon a reasonable evaluation of credibility." Shane's testimony about sighting a deer and firing at it after properly identifying his target, the Court of Appeal considered quite positive testimony. And they held that the jury could reasonably have concluded that Shane had exercised reasonable care and had in fact identified a deer before firing. As noted at the outset of this opinion, the Court of Appeal's upholding the jury verdict upon finding it "based upon a reasonable evaluation of credibility" is the application of a standard of review quite similar to the test rejected in Arceneaux, supra. It is not enough to sustain the determination of the district court when "there is some reasonable evidence to support the finding." Rather, the appropriate question is, was that finding clearly wrong or manifestly erroneous. Our answer to this question is that it was clearly wrong.
Shane's testimony regarding the sighting of the deer was quite equivocal.[12] Even his *973 statement quoted by the Court of Appeal clearly progresses, with the benefit of leading questions, from an expression of doubt, to assurance concerning the object sighted. Shane initially responded that "I thought I saw something," explained that "[t]o the best of my knowledge, I saw a deer," and finally asserted in answer to a direct question that there was no doubt in his mind that he was looking at a deer when he fired. And, since it is highly unlikely that a deer would have been meandering across a field, drinking water in close proximity to a man walking in the open along a nearby field road, it is much more likely, if not entirely certain, that there was no deer, and that Shane was following the movements of Doyle Watson as he was walking along a rutted road, partially obscured by a knoll in the center of the field and grass about two feet high.[13]
Although the accident might have been avoided had Mr. Watson worn the "Hunter orange" vest or called out to Shane on entering the field, it seems equally likely that an experienced hunter, such as Earl Creel, would have correctly interpreted the moving object as a man rather than a deer. We believe that Earl Creel's negligence in either failing to provide his young son with a supervised experience in sighting large game through a scope and firing this high-powered rifle, or closely supervising him on this occasion was a cause in fact of Mr. Watson's accidental death. We also believe that causation for the accident must be attributed to Shane as well as to his father. The twelve year old must share some responsibility for this death in view of his own negligence in firing a dangerous weapon at a man he presumed to be a deer.
Having determined that the jury's allocation of 100% fault to the plaintiff was against the weight of the evidence, and was clearly wrong, we are empowered by La.Code Civ.Pro.Ann. art. 2164 to "render any judgment which is just, legal, and proper upon the record on appeal."[14] We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance.[15] In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979),[16] which *974 incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Our consideration of these factors suggest that the majority of the fault must rest with the Creels. The causal relation between negligently firing a dangerous weapon and/or negligently failing to instruct or supervise a minor child in the use of the weapon, and plaintiff's death, is a direct one. On the other hand, plaintiff's failure to wear Hunter orange or signify his presence may have contributed to the youth's fatal error in identifying his target. But it was not as directly related to the plaintiff's demise as was the conduct of the Creels.
Furthermore, the factors suggested in evaluating the conduct of the parties indicate that a lesser degree of fault should be attributed to plaintiff. His conduct, at least in walking along the field road within the boy's rifle range, was inadvertent. His failure to don the bright hunting vest, however, was a conscious action which necessarily involved adverting to, or consciously considering the risk, or possible danger. Nevertheless, plaintiff's omissions at worse had only an indirect causative impact on the accident. In contrast, none of the actions of Shane or his father Earl Creel can be considered inadvertent. They were aware that the high-powered rifle was deadly and that it was imperative to discern a target with certainty before firing. In a similar vein, the risk of firing or failing to train and supervise the firing of such a weapon had a direct potential for fatal consequences. And, in considering possible mitigating factors, the Creels had no higher motive than sport when their acts of negligence occurred, and their actions were not dictated by any emergency or other circumstance which could lessen the fault attributed to this poor judgment. Finally, with regard to capacity, the age and experience of Watson and Earl Creel would require a greater imposition of fault on them for their negligent conduct, in comparison to that of the twelve year old youth, Shane.
After weighing the factors discussed hereinabove, we apportion the fault as follows. To plaintiff, we assign 20% of the fault in this fatal accident. We find further that Earl Creel and his son, Shane Creel, were each also at fault, and the degree or percentage of negligence attributable to them was 40% each.
There remain in this lawsuit issues concerning quantum which are still to be resolved and which we determine should appropriately be decided by the Court of Appeal. This includes the assessment of damages for each of the plaintiffs, as well as reduction thereof by virtue of 1) Doyle Watson's percentage of contributing fault, and 2) the possible reduction attendant to plaintiffs' having settled prior to trial with Farm Bureau Insurance Company.

Decree
The judgments of the district court and the Court of Appeal are therefore reversed; the case is remanded to the Court of Appeal for further consideration and for entry of judgment consistent with law and with the views expressed herein.
REVERSED; REMANDED.
NOTES
[1] Earl Creel testified that he heard the report of the Marlin 30-30 rifle at approximately 5:25 P.M. He had begun to get off his stand in anticipation of the group's departure. He noted that the sun had set but there was still sufficient light for the hunters to drive their truck without the use of headlights and that they were able to locate Mr. Watson's body without the use of a flashlight.
[2] The hunting party included, besides young Shane Creel, his father Earl Creel, his grandfather Willie Creel and his stepbrother Tony Lala. Mr. Watson and Willie Creel were acquaintances of long standing, but Mr. Watson met the other family members for the first time on the day of the accident. He had no knowledge of their hunting experience or expertise.
[3] Detective Jack Underwood of the Washington Parish Sheriff's Department testified that he personally hunted deer with a shotgun and considered it the most often used weapon. Earl Creel, however, asserted that the 30-30 was very popular for deer hunting. Nevertheless, everyone in the Creel party other than Shane was armed with a shotgun, either 20 gauge or 12 gauge.
[4] Shane testified that he "shot two different bullets in it on the same day."
[5] La.Rev.Stat.Ann. § 56:143 provides:

Any person hunting deer shall display on his head or chest, and/or back a total of not less than four hundred square inches of material of daylight fluorescent orange color known as "Hunter orange". These provisions shall not apply to persons hunting deer on property which is privately owned and legally posted, or to archery deer hunters except when bow and arrow are used to hunt deer on wildlife management areas where a gun season for deer is in progress.
Whoever violates the provision of this section shall be fined not more than $100 or imprisoned for not more than ninety days, or both.
Watson was hunting deer on his own privately owned farm. Nonetheless, since his property was not legally posted, he was technically in violation of the statute. However, this court in Breithaupt v. Sellers, 390 So.2d 870 (La.1980), decided, when contributory negligence was the prevailing law, that a hunter/victim in violation of R.S. 56:143 (the Hunter orange requirement) was not necessarily contributorily negligent, that causation was for the factfinder, and that thus a directed verdict had improperly been granted.
[6] Under La.Civ.Code Ann. art. 2318, parents "are responsible for the damage occasioned by their minor or unemancipated children residing with them, ..." In this case, Janice R. Creel and Earl Creel, Shane's parents, were divorced, and Shane generally resided with his mother Janice, who had been awarded his custody. Since she was vicariously liable for Shane's negligence under art. 2318 and the jurisprudence under that article (and perhaps because Shane himself was an insured under his mother's homeowner's policy because an occupant of the home), Janice's homeowner's liability insurer, Farm Bureau, settled with the Watsons by paying $85,000, 85% of the policy limits. Coincident therewith, the Watsons executed a release of Janice Creel and Farm Bureau from all claims as a result of the accident and executed also a covenant with Mrs. Creel and Shane to desist from asserting against Shane any claim in this regard. Liability on the part of Mr. Creel, the non-custodial parent, is predicated on proof of his own negligence.
[7] La.Civ.Code Ann. art. 2323 provides:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
[8] The effective date was postponed while the Legislature authorized a thorough study of comparative negligence, indicating a legislative willingness to reconsider the issues presented by the concept of comparative negligence before the scheduled effective date of the statute. R. Pearson, Apportionment of Losses Under Comparative Fault LawsAn Analysis of the Alternatives, 40 La.L.Rev. 343, 343-44 (1980).
[9] The apportionment of losses, however, may be accomplished by either of two systems, pure comparative fault or modified comparative fault (the latter not being the type in effect in Louisiana.) Both are based upon the principle that liability should be proportionally related to negligence. This includes an apportionment between plaintiff and defendant, as well as among defendants. Under modified comparative negligence, the plaintiff will not recover in some instances where less than all of the negligence is allocated to him. Under the pure comparative fault system, adopted by the Louisiana legislature in 1980, plaintiff's negligence will only diminish, not defeat, recovery as long as plaintiff's negligence is less than 100%. See R. Pearson, Apportionment of Losses, 40 La.L.Rev. 343, 344 (1980). Thus, in at least negligence cases, as opposed to those involving strict liability, the application of the comparative fault system is straight forward. Legal scholars have enumerated the basic elements: (1) the plaintiff's negligence, even if it comprises 99% of the total fault, only diminishes his recovery according to the percent of negligence found against him by the trier of fact; (2) although tortfeasors obligated for the same injuries continue to be solidarily liable, under La.Civ.Code Ann. art. 2324, that defendant whose fault is less than the plaintiff's owes only his percentage of plaintiff's damages; (3) the defendants' percentages of fault determine their contribution rights; (4) a tortfeasor who settles is insulated against claims for contribution, as well as liability to the plaintiff; and (5) although the nonsettling tortfeasor's contribution rights are defeated by the settlement, he has the right to have the plaintiff's recovery against him reduced in proportion to the percentage of fault assigned to the settling tortfeasor. D. Robertson, Ruminations on Comparative Fault, Duty-Risk Analysis, Affirmative Defenses, and Defensive Doctrines in Negligence and Strict Liability Litigation in Louisiana, 44 La.L.Rev. 1341, 1345 (1984).
[10] A "fault line" has been suggested as a method of conceptualizing the share of negligence attributable to each party. One end, designated with a value of zero, would indicate the absence of fault; at the other end, a value of ten would indicate deliberate wrongdoing. The factfinder can then designate on the line where the conduct of each party falls. From the scale, the various allocations of fault can be converted to percentages. R. Pearson, Apportionment of Losses Under Comparative Fault Laws, 40 La.L. Rev. at 348-49.
[11] La.Code Civ.Pro.Ann. art. 1812 provides in pertinent part:

C. In cases to recover damages for injury, death, or loss, the court may submit to the jury, unless waived by all parties, special written questions inquiring as to:
* * * * * *
(2) If appropriate, whether another person, whether party or not, other than the person suffering injury, death, or loss, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
Thus, although Shane is not a party to this suit, "the factfinder may assign a percentage of fault to every person involved in the accident, presumably including those persons who have been released by the plaintiff." M. Chamallas, "Comparative Fault and Multiple Party Litigation in Louisiana, 40 La.L.Rev. 373, 374 (1980).
For a recent case of this court where art. 1812 was discussed, see Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984).
[12] A review of the record also discloses some very questionable testimony by Shane. In one instance, Shane testified that he had sighted a deer and fired the rifle earlier in the afternoon. Since the distinctive report, clearly heard by Earl Creel when Shane fired the fatal shot, had not been heard earlier, Shane's testimony in this regard seems suspect.
[13] Jack Underwood, the investigating detective from the Washington Parish Sheriff's Department testified that the field road had potholes and an up and down motion in it. He noted that "at some points, you could see a subject and some points you couldn't walking down the road."
[14] According to Comment (a), "[t]he purpose of this article is to give the appellate court complete freedom to do justice on the record."
[15] Although our apportionment is admittedly somewhat inexact, it is certainly superior to the "all-or-nothing position" imposed by the theory of contributory negligence. See J. Wade, Comparative NegligenceIts Development in the United States and Its Present Status in Louisiana, 40 La.L.Rev. 299, 314 (1980).
[16] Uniform Acts are drafted by the National Conference of Commissioners on Uniform State Laws, composed of representatives, termed Commissioners, from within the legal profession of each of the fifty states as well as the District of Columbia and Puerto Rico. In order "to promote uniformity in state law on all subjects where uniformity is deemed desirable and practical," the Conference recommends acts for general adoption throughout the jurisdiction of the United States. While Louisiana has adopted some twenty-two of the one hundred twenty-five uniform laws, such as the Child Custody Jurisdiction Act, articles 1, 3, 4, 5, 7 and 8 of the Commercial Code, the Criminal Extradiction Act, the Gifts to Minors Act, and the Trade Secrets Act, it has not incorporated the entirety of the Uniform Comparative Fault Act into its law. Several matters such as set-off, the effect of the release of one tortfeasor on the contribution rights of others, as well as the standard to be used in apportioning percentages of fault, have by the Louisiana Legislature apparently been left for Louisiana courts to resolve. The Uniform Act, however, benefiting from the comments of many sources during its special committee's five years of consideration, addressed all potential problems and attempted to provide the best solutions for them.