540 So.2d 287 (1989)
Thomas L. LEE, Sr.
v.
MISSOURI PACIFIC RAILROAD COMPANY, et al.
HIGHLANDS INSURANCE COMPANY
v.
MISSOURI PACIFIC RAILROAD COMPANY, et al.
No. 88-C-2694.
Supreme Court of Louisiana.
March 13, 1989.
Rehearing Denied April 20, 1989.
*288 Charles Soileau, Bertrand & Soileau, Rayne, for applicant.
Candice Maria Hattan, Roy & Hattan, Lafayette, James Dubuisson, Earl Taylor, Taylor & Trosclair, Opelousas, for respondent.
WATSON, Justice.
This case involves a collision between a pickup truck driven by plaintiff, Thomas L. Lee, Sr., and a Missouri Pacific Railroad engine. Lee was employed by Solids Control, Inc., an oil field service company which had workers' compensation insurance with Highlands Insurance Company. Lee settled his claim with Highlands for a lump sum of $40,000 plus prior compensation benefits of $24,888 and medical expenses of $35,298. Lee and Highlands agreed that they would pursue claims against the Missouri Pacific Railroad Company and the Louisiana State Department of Transportation and Development (DOTD) with all proceeds to be divided equally up to a limit of $50,000 for Highlands. Lee and Highlands then settled their claims against the railroad for $65,000.
After a bench trial, it was determined that the Missouri Pacific Railroad was thirty-five percent at fault; the State of Louisiana thirty-five percent at fault; and Thomas *289 L. Lee, Sr., thirty percent at fault. Damages were fixed at $475,211 plus legal interest. Judgment was rendered in favor of Lee and Highlands and against the DOTD for $166,323.85 plus all court costs. The DOTD appealed from the judgment, and the court of appeal affirmed.[1] A writ was granted to consider the liability of the DOTD.[2]
The DOTD's exception of prescription was overruled on the ground that the DOTD was a joint tort-feasor and therefore solidarily liable for plaintiff's injuries. Disposition of the exception depends on whether the DOTD is determined to be a joint tort-feasor.

FACTS
On February 2, 1982, just before noon, the engine of a train going south from Alexandria to Opelousas was hit by Lee's pickup at the crossing of Louisiana Highway 3043. At that point, the train's tracks cross the highway at an obtuse angle. Ronald A. Jenkins was operating the train from the left side of the engine's cab. The engine was pulling a caboose, six loaded cars and two empty cars. The two other men in the cab were seated on the right hand side.
Part of the Missouri Pacific right-of-way and the adjoining private property was overgrown with brush and trees which obscured northwest bound motorists' view of the track area on the right. Lee was driving northwest in his pickup.
Two trains generally pass the crossing daily: one southbound and one northbound. The crossing was marked by: (1) a standard crossbuck sign located 10 feet from the center line of the track and 17 feet from the center line of the highway; (2) faded pavement markings 218 feet ahead of the crossing; and (3) a round warning sign 361 feet before the crossing. According to federal studies, such passive warning devices provide a minimum level of warning.
Between the whistle board, 1,490 feet from the crossing, and the road, Jenkins caught glimpses of Lee's truck between the trees. The pickup was not continuously visible because of the obscuring trees and brush on the left side of the railroad right-of-way. About one-quarter mile from the intersection, Jenkins blew the whistle and rang the bell: the train maintained its speed limit of 30 miles per hour. When Jenkins was approximately two engine lengths from the crossing, he had the impression that the pickup was not going to stop and he applied the train's emergency brakes. Lee's pickup struck the left side of the engine on the front of the fuel tank. The train traveled six to seven car lengths from the crossing before coming to a complete stop.
Engineer Jenkins had observed several near misses at this intersection and had seen one similar accident. On September 28, 1981, a Mr. Daigle was killed by a southbound train while driving northwest.
In Daigle's accident and in Lee's, both the train and the driver were traveling in the same directions. On January 6, 1978, there had been another parallel accident involving a Mr. Darbonne. There had also been accidents in October of 1979 and in November of 1981, although the crossing has little traffic.
Lawrence J. Paddio, head brakeman and a lookout for the train, was sitting on the right side of the cab. He did not see the pickup until after it had struck the engine. As the train went through the crossing, the whistle was blowing and the bell was ringing. The double light on the front of the train was burning but it was not an oscillating light.
Although the day of the accident was misty and rainy, it was not particularly cold. Lee generally played his truck radio while driving and was probably listening to it before the accident. He travelled the road on an average of twice a day, but he had never seen a train on the track. Train whistles could be heard from his nearby *290 home. Since the crossing was a little rough, Lee usually slowed down but he had never thought about stopping. The speed limit was 55 miles per hour. Lee said he was going 30 to 35 miles an hour as he came out of a curve and approached the crossing. He did not hear or see the train until just before he hit it. When he did see the train, he cut his wheels to the left and slammed on his brakes.
The 1983 "Traffic Control Devices Handbook" published by the U.S. Department of Transportation notes:
"A train in the vicinity of a crossing exerts the greatest demands on the driver. The train, itself, through the use of horns and/or headlights provides the principal warning at a passive-controlled crossing. While it is vital for the motorist to perceive these warnings, there are several factors that may limit the motorist's ability to detect an approaching train:
"Noise such as from a truck exhaust or a car radio can mask a train's horn warning.
"Under adverse weather conditions the field of view may be greatly limited.
"There may be inadequate sight distance caused by highway alignment or by obstacles in the sight triangle (e.g., buildings, other vehicles, vegetation, signs, etc.)
"The most critical element within the critical stopping distance zone is for the motorist to be able to see the train or to be alerted by traffic control devices, far enough from the grade crossing, to be able to react and stop safety (sic).

* * * * * *
"Various factors may influence the motorist's ability to hear an audible signal. Motorists with impaired hearing or operating vehicles with closed windows, air-conditioning, a radio or stereo, may not hear warning signals in time to react. Therefore, although an audible signal system may be desirable or even necessary, it should be considered as a supplemental system, and not as a substitute for other devices."[3]
Officer Randal J. Leger investigated the accident. Lee's GMC pickup had heavy damage to the front end. The impact was fourteen feet from the front of the locomotive. The pavement was wet and there were no skid marks. South of the pickup truck, approximately 450 feet from the intersection, was the Missouri Pacific train. One of the trainmen told Leger the whistle and bell were activated about 600 feet from the crossing. Lee was cited for failing to yield at a railroad crossing contrary to LSA-R.S. 32:171.
The DOTD receives periodic computer printouts from the Department of Public Safety concerning accidents. The DOTD's signing of railroad crossings is federally funded with a grant of up to $3.5 million a year, but the DOTD recommends an annual priority list for signing. Because this crossing had a low priority, it had only crossbucks, the minimum legal signing.
According to Michael Morgan, an employee of the DOTD, priorities were assigned in 1981 and 1982 on the basis of outdated 1974 information. It was not until 1983, after Lee's accident, that the factor of accident frequency was even considered in assigning priorities.
Duaine Evans, a traffic engineer, testified as an expert in that field. Evans said the DOTD's records showed four prior accidents at this intersection between 1978 and 1981, an average of one a year. Evans considered this an excessive number in view of the low train and vehicle traffic at the crossing. After Lee's accident, the crossing was evaluated and the signing was upgraded with automatic electric warning signals.
In expert Evans' opinion, the crossing was unsafe and the signing inadequately protected motorists. Some protection would have resulted from a reduced speed limit. The restricted sightlines to the right and the accident record showed that the crossing was unreasonably dangerous. On a wet pavement, at a speed of 45 miles per *291 hour, Lee would have needed 234 feet to react and bring his vehicle to a stop. This maneuver would require 5.6 seconds and a train traveling 30 miles per hour would travel 246 feet in that length of time. Thus, Lee would have had to be able to see the train when he was 234 feet from the crossing and the train was 246 feet from the crossing. Lee could not see the train at that point. The available sight distance was therefore inadequate.
According to Evans, factors contributing to the accident were: (1) the inadequate signing of the crossing, (2) the outdated and incomplete information the DOTD utilized in setting its priorities; and (3) the inadequate view of the train track available to motorists.
In Evans' opinion, the crossing needed an automatic device that would signal a driver when a train was coming with flashing lights, or gates, or both. With inadequate sight distance and low train traffic, motorists would tend to disregard the possible hazard of a passing train. If flashing lights and/or gates had been financially unfeasible, stop signs could have been erected at a cost of approximately two hundred dollars.
Expert David L. Bernard took a videotape of the accident scene and used it to illustrate how the foliage camouflaged the oncoming train. In Bernard's opinion, a simple stop sign would have helped motorists, and flashing lights would have been a positive stimulant. In his experience, crossbuck signs tend to be ignored: drivers take them for granted.

ISSUE
Since the DOTD had no control over the obscuring trees and foliage which made the crossing dangerous, the question is whether the railroad crossing was adequately signed to warn Lee and other members of the motoring public about the hazard.

LAW AND CONCLUSION
"In order to hold the Department of Highways liable for an accident caused by an unsafe or hazardous condition it must be shown that the Highway Department had prior notice, either actual or constructive, of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and warn motorists of its presence and failed to do so."[4]
LSA-R.S. 32:171 provides as follows:
"Obedience to signal indicating approach to train
"A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
"(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train.
"(2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train.
"(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard.
"(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
"B. No person shall stop a motor vehicle upon any railroad crossing.
"C. No person shall drive any vehicle through, around, or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed when an approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
"D. No person shall drive any vehicle across any railroad crossing while the signal devices are flashing when an approaching railroad train is plainly visible *292 and is in hazardous proximity to such crossing."
LSA-R.S. 32:172 provides as follows:
"All vehicles must stop at certain railroad grade crossings
"The department may designate particularly dangerous highway grade crossings of railroads and erect stop signs thereat. When such stop signs are erected, the driver of any vehicle shall stop within fifty feet, but not less than fifteen feet, from the nearest rail of such railroad and shall proceed only upon exercising due care."
The trial court correctly analyzed the comparative fault of the various parties under the guidance of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
Reasonable people could differ about the DOTD's fault in causing this accident. However, the DOTD had notice of four prior accidents in four years and should have known that the crossing was dangerous. It failed to consider accident frequency in assigning its priorities, thereby ignoring the hazard at this crossing. Between 1978 and this accident in 1982, the DOTD had ample time to take corrective measures. In view of the four prior accidents in the preceding four years and several near misses at this rural crossing, the trier of fact could reasonably have concluded that this was a particularly dangerous crossing at which a stop sign should have been erected. LSA-R.S. 32:172. If such a sign had been in place, it must be presumed that Lee would have obeyed its signal to stop.
The DOTD negligently relied on outdated information and failed to consider previous accidents in assigning a priority to this crossing. If flashing signals had been financially unfeasible after the fourth accident, simple stop signs could have been erected for about two hundred dollars. The speed limit for motorists approaching the crossing could also have been reduced from 55 miles per hour at a minimal cost.
A trier of fact could also have reasonably concluded that the railroad was at fault in not clearing its right-of-way and that Lee was at fault in not looking for a train before crossing the track. However, according to the expert testimony, motorists customarily ignore crossbuck signs.
Although Lee was cited for violating LSA-R.S. 32:171, there were no electric or mechanical signal devices present. There was neither a flagman nor a lowered crossing gate. The train was not plainly visible. Lee was not stopped on the track. He did not evade a gate or barrier and no signal device was flashing. Lee did not hear the train's whistle and bell: if he had heard them, he obviously would have stopped. Lee's only violation was a passive one: his failure to hear the train's bell and whistle, probably because his windows were closed and the radio was playing. The statute does not impose an absolute duty to stop at all railroad crossings. See Thomas v. Missouri Pacific R. Co., 466 So.2d 1280 (La.1985).
Lee's conduct was inadvertent. He was not consciously aware of the danger at the crossing because he had never seen a train there. The negligence he displayed is apparently common among the general public.
A great risk of harm to the motoring public was caused by the railroad's failure to clear its right-of-way and the DOTD's failure to recognize the dangerous nature of the crossing. The DOTD, provided with information about four accidents in four years at a train crossing on a rural road, failed to recognize the dangerous nature of the crossing and failed to sign it with even the minimum precautions of a stop sign or reduce speed sign. Both the railroad and the DOTD were in a superior position vis-a-vis Lee. However, there were no extenuating circumstances which required Lee to proceed without looking for a train.
Weighing all of the Watson factors, the trial court was not clearly wrong in finding Lee 30% at fault and the railroad and the DOTD each 35% at fault.
The court of appeal reviewed the evidence in detail and correctly concluded that the trial court had made reasonable evaluations *293 of credibility and reasonable inferences of fact which were not clearly wrong. This court has no basis for substituting a different view of the evidence and reallocating the percentages of fault determined by the trial court. The matter is entirely factual and has been carefully considered by both the trial court and the court of appeal.
The DOTD contends that the trial court abused its discretion in the damages awarded. Lee's pain and suffering were fixed at $225,000; loss of wages prior to trial at $83,741; future lost wages at $123,672; medical expenses as of trial at $35,298; and future medical expenses at $7,500.
Lee, then forty-nine years of age, was admitted to the hospital in acute pain. He had multiple fractures in his right hip, a ruptured spleen, four broken ribs, multiple abrasions and contusions. The spleen was the most urgent injury, and he had a splenectomy combined with an exploratory laparotomy to detect any other internal injuries.
Later, on February 9th, Lee had surgery on his badly damaged hip. At that time, the operating surgeon, Dr. Frazier Gaar, said there was only a 50 percent chance of salvaging Lee's right hip.
During the surgery, posterior fragments were joined to the acetabulum with large threaded K wires. A 50 millimeter cancellous bone screw and washer were lagged into the acetabulum and two smaller threaded pins were put in the other bone fragments. A large threaded Steinman pin was placed in the distal femur to enable Lee to be placed in balanced skeletal traction.
After the surgery, Dr. Gaar said Lee's prognosis was not good because of the severity of the fractures. Traumatic arthritis and avascular necrosis were described as a reality which might later require hip joint replacement.
On March 11th, the Steinman pin was removed under a local anesthetic. Lee remained in the hospital until March 12, 1982, but continued treatment and therapy on an outpatient basis.
For a year after his hip surgery, Lee remained totally disabled and unfit for any type of work. After that first year, his condition regressed at a steady rate. On December 2, 1983, about a year and nine months after his injury, Lee was still having constant pain in his hip and limping noticeably from a shortened leg. X-rays showed significant deterioration of the hip with raw bone contact in the weightbearing portion of the acetabulum and some subluxation. Lee's steady regression and increasing pain resulted in a total hip replacement on February 16, 1984. At the time of the hip replacement, the femoral head had been "chewed up" by the bone on bone contact and destroyed by arthritis.[5]
According to Dr. Gaar, Lee now has a twenty-five to thirty percent permanent impairment of his right leg and hip and walks with a permanent limp. He will need another hip replacement during the next ten years.
Because of his splenectomy, Lee has a reduced immune response to bacteria and viruses, giving him a greater susceptibility to infections and a reduced ability to fight infections. In some cases, people without spleens die of sepsis or overwhelming infections.
Lee underwent three serious operations, was totally disabled and endured severe pain for two years. He has a permanent limp, a permanent physical impairment, increased susceptibility to infection due to the loss of his spleen, and surgical scarring. The award of $225,000 for pain and suffering is not excessive.
The future hip replacement that Dr. Gaar testified would be required in ten years would entail a surgical fee of $3,000 to $3,500 and the hospital records in evidence fully justify an award of $7,500 for future medical expenses.
The losses of past and future wages were based on the testimony of an LSU professor of economics, Dr. George Randolph *294 Rice. Dr. Rice testified that Lee's past loss of wages was $83,741. Using a discount rate of eight and a half percent and a work life expectancy of 9.61 years, Dr. Rice estimated Lee's future loss of wages at $123,672. The trial court did not err in adopting this uncontradicted evidence.
The trial court did not abuse its discretion in imposing costs upon the only defendant at trial, the DOTD. LSA-C.C.P. art. 1920.[6]
The settlement with the Missouri Pacific Railroad Company was made after the effective date of LSA-C.C. art. 1803 which provided as of January 1, 1985, that the remission of a debt of one solidary obligor benefits other solidary obligors only to the extent of the payment. The remission of debt in favor of one obligor does not extinguish the solidary obligation.
Because the DOTD is a solidary obligor with the Missouri Pacific Railroad Company, suit in a court of competent jurisdiction against the Missouri Pacific Railroad Company interrupted prescription against the DOTD. LSA-C.C. arts. 1799;[7] 3503.[8]
For the foregoing reasons, the judgment of the court of appeal is affirmed.
AFFIRMED.
MARCUS and LEMMON, JJ., dissent and assign reasons.
MARCUS, Justice (dissenting).
Under the facts of this case, I do not consider that DOTD was at fault. The warning devices adequately marked the crossing. Plaintiff, who traveled the road twice a day, testified that he never stopped or looked before crossing the tracks because he had never seen a train there before. He did not hear the train's bell and whistle because his windows were closed and the radio was playing. Under these circumstances, additional signing by DOTD would not have prevented the accident.
Accordingly, I respectfully dissent.
LEMMON, JUSTICE, dissenting.
Additional warning signs would not have prevented this accident.[1] Therefore, the Department's failure to install additional warning signs was not a substantial factor in the causation of this accident. The judgments of the lower courts should be reversed.
NOTES
[1] Highlands Ins. v. Missouri Pacific R. Co., 532 So.2d 317 (La.App. 3 Cir.1988).
[2] 534 So.2d 435 (La.1988).
[3] Tr., pp. 591, 593.
[4] U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 at 785 (La.1976).
[5] Tr. 421.
[6] LSA-C.C.P. art. 1920 states:

"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
"Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
[7] LSA-C.C. art. 1799 states:

"The interruption of prescription against one solidary obligor is effective against all solidary obligors and their heirs."
[8] LSA-C.C. art. 3503 provides:

"When prescription is interrupted against a solidary obligor, the interruption is effective against all solidary obligors and their successors.
"When prescription is interrupted against a successor of a solidary obligor, the interruption is effective against other successors if the obligation is indivisible. If the obligation is divisible, the interruption is effective against other successors only for the portions for which they are bound."
[1] Plaintiff knew that the track was there, crossed it twice a day, and had never previously stopped or looked before crossing the track. It is highly improbable that the installation of another sign warning of the track would have changed plaintiff's behavior on this particular day.