722 So.2d 296 (1998)
Shirley Purvis MOORE, Plaintiff-Appellee,
v.
KANSAS CITY SOUTHERN RAILROAD CO., et al., Defendant-Appellant.
Joseph Richard Moore, Plaintiff-Appellee,
v.
Kansas City Southern Railroad Co., et al., Defendant-Appellant.
Nos. 31,080-CA, 31,081-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1998.
Dissenting Opinion October 30, 1998.
Writ Denied January 29, 1999.
*297 Joseph B. Stamey, Natchitoches, Counsel for State of Louisiana, DOTD.
Christopher L. Whittington, R. Michael McHale, Lake Charles, Donald G. Kelly, Natchitoches, Counsel for Shirley Purvis Moore.
Joseph Wm. Bailey, Logansport, Counsel for Joseph Richard Moore.
Before MARVIN, C.J., and NORRIS and CARAWAY, JJ.
Dissenting Opinion of Judge Caraway October 30, 1998.
NORRIS, Judge.
The State Department of Transportation and Development ("State") appeals a judgment finding that a railroad crossing posed an unreasonable risk of harm to motorists, and assessing the State with 70% fault for a collision between a train and a truck. The only issues on appeal are the finding of liability and the allocation of the State's comparative fault. Finding no manifest error, we affirm.

Factual background
The crossing in question is located in DeSoto Parish. A Kansas City Southern ("KCS") train track running north and south intersects a State Highway, La. 5, which runs roughly southwest to northeast. The highway takes a downward slope as it meets the tracks at a 60-64° angle. The southwest corner of this intersection is actually a hill which is overgrown with trees and brush, obscuring a motorist's view of the track to his right and the conductor's view of eastbound vehicles. The crossing was marked by a standard cross buck sign in the KCS right of way, faded pavement markings denoting a railroad crossing, and a round black and yellow railroad crossing warning sign.
On the morning of November 7, 1992 Joseph Moore was driving his pickup truck east on La. 5, approaching the crossing. His daughter, Jessica, was a passenger. Meanwhile, a KCS train with 115 train cars was traveling north at about 38 miles per hour. Murphy Weeks, the conductor, testified that because of the embankment to his west he could not see Moore's truck until he was some two train-car lengths from the crossing. He also stated, however, that the train whistle blew continuously from the time it passed the whistle board 1300 feet before the crossing, or about 25 seconds. The train collided with Moore's truck as it was crossing the track. According to deposition testimony, Moore's habit was to slow down, if not stop, when crossing this track.[1] There were no skid marks on the pavement.
*298 The front of the train engine impacted the passenger door of the truck, pushing the truck 1,085 feet along the track before the train came to a stop. Both Moore and his daughter suffered fatal injuries as a result of the collision.
Shirley Moore, Joseph's wife and Jessica's mother, and Joseph Moore Jr., Joseph's adult son from a prior marriage, sued the State, KCS and E.E. Pitchford, the operator of the train. The State did not cross claim KCS. After settling with KCS and Pitchford and dismissing them from the suit, the plaintiffs proceeded to a bench trial against the State alone. Prior to trial, both sides stipulated the value of both plaintiffs' damages in the event any fault was assigned to the State. The State further stipulated that it had custody, control and ownership of La. 5 up to the crossing. With the parties' consent, the trial judge visited the accident site to aid in the assessment of conflicting evidence about the sight distance approaching the crossing.
At the conclusion of trial, the court found that the crossing presented an unreasonable risk of harm to the motoring public. The court found an obstruction in the line of vision for both a driver going east on La. 5 and a conductor going north on the track, and a lack of adequate warning devices. The court assigned fault 70% to the State and 30% to Joseph Moore. Judgment was rendered reflecting the stipulated damages and the allocation of fault. The State has appealed with respect to both plaintiffs.[2]

Applicable law
To establish a breach of the State's duty to provide a reasonably safe road, the plaintiff must prove: (1) the thing which caused the damage was in the care or custody of the State; (2) a hazardous condition existed; (3) the State had actual or constructive knowledge of the condition; and (4) the State failed to take corrective action within a reasonable period of time. Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311. While not the insurer of the safety of drivers, the State cannot knowingly allow a condition to exist that is hazardous to a reasonably prudent driver. Thompson v. Coates, 29,333 (La.App. 2 Cir. 5/7/97), 694 So.2d 599, writs denied 97-1442, 97-1521 (La.9/26/97), 701 So.2d 985, 987; Caruthers v. State, 97-1450 (La.App. 3 Cir. 4/15/98), 711 So.2d 420, and citations therein.
A railroad crossing is considered a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to force him into a position of peril, dangerously near the tracks, before he has a view of the oncoming train. Rivere v. Union Pacific R. Co., 93 1132 (La.App. 1 Cir. 10/7/94), 647 So.2d 1140, writ denied 95-0292 (La.3/24/95), 651 So.2d 295; Fry v. Southern Pacific Transp. Co., 30,540 (La.App. 2 Cir. 6/24/98), 715 So.2d 632.
The driver or operator of a motor vehicle approaching a rail-highway grade crossing identified by a railroad cross buck sign must slow down to a speed reasonable for the existing conditions, or stop if necessary, at the point nearest the track where the driver or operator has a clear view of any approaching train. The driver or operator must listen and look in both directions for any approaching train. After he has slowed or stopped in this manner, he must yield the right of way to the train, and then proceed only after exercising due care and upon being certain that it is safe to proceed. La. R.S. 32:175.
The District Court's findings of fact are not disturbed on appeal unless the reviewing court finds that they are clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Under the manifest error standard, the linchpin is whether the trial court's findings are reasonable; even if the appellate court feels its own evaluation of the evidence is more reasonable, the trial court's findings cannot be reversed if they are in fact reasonable. Lewis v. State, supra. In other words, the appellate court may not reverse simply because it is convinced that had it been sitting as a trier *299 of fact it would have ruled differently. Lewis v. State, supra. The manifest error rule also regulates allocations of fault. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607; Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).

Discussion: Unreasonably dangerous condition
By its first assignment the State urges the District Court committed manifest error in assessing any fault to the State. The argument is that the State is free of fault because Moore violated his statutory duty to yield and stop for the approaching train under R.S. 32:171 and 175. The State further argues that the crossing in question did not pose an unreasonable risk of harm, and that Moore's conduct was not that of a "prudent driver." Alternatively, by its third assignment, the State contends it lacked notice of this condition.[3]
The plaintiffs' expert, Mr. Jim Clary, testified regarding the danger posed by this crossing. He concluded that the road's alignment with the railroad right of way caused Moore's truck to approach the tracks at an acute angle and down a steep slope. The hill abutting the right of way partially, if not totally, obstructed the view of an oncoming train. Additionally, the plaintiffs' photos of the crossing, taken only one week after the accident and looking south, reveal a tangled mass of weeds, small trees and underbrush extending from inside the right of way to the crest of the high embankment.
Citing standards of the American Association of State Highway and Transportation Officials ("AASHTO") from the 1950sprior to the time of the State's last construction work on La. 5Mr. Clary discussed the significant design defects in the highway's alignment with the railroad tracks, which prevent eastbound drivers from being alerted by the sight of an oncoming train. The poor maintenance of the right of ways of both the State and KCS further exacerbated the visibility problem. Given the angle, the embankment and the vegetation, a driver's view would become unimpaired only some 50-75 feet before the intersection. At that point, the embankment begins its significant downward slope to the ditches along the track and road. The trial judge's personal inspection of the site obviously confirmed the expert testimony that the crossing was hazardous.
A similar railroad crossing accident was at issue in Lee v. Missouri Pacific R. Co., 540 So.2d 287 (La.1989). The intersection in Lee was unreasonably dangerous because of restricted sight line available along the highway which, as in the instant case, approached the crossing at an angle to the track. The crossing was marked only by cross bucks and had considerable overgrowth along the railroad's right of way. See, Highlands Ins. Co. v. Missouri Pacific R. Co., 532 So.2d 317 (La.App. 3 Cir.1988) (appellate opinion). The driver, who was ticketed under R.S. 32:171 for failing to yield, was unable to see the oncoming train from a great enough distance to allow him to stop his vehicle on the wet pavement. With a speed limit of 55 mph, the plaintiff's vehicle traveling 30-35 mph slammed into the side of the train.
As in Lee, the same risk factor of inadequate sight lines is present here, creating a trap for motorists. The driver is obviously negligent for failing to heed the passive warning signs, but the information presented in evidence in Lee and in the instant case regarding highway safety standards emphasizes the critical element of visibility. Thus even a motorist who fails to respond to passive signs should be able to see the moving train or be alerted by an active warning control device, such as blinking red signals.
In view of the rationale of Lee, supra, we reject the State's argument that this crossing did not present an unreasonable risk of harm or that Moore's failure to yield and stop made him totally at fault in the accident. We note that the District Court rejected as "biased and unreliable" the testimony of the State's expert, Dr. Joseph Blaschke, who said Moore had an absolute duty to yield and stop, and felt that the passive warning signs in place were adequate. Since we have affirmed the finding of an unreasonable risk of *300 harm based on the physical evidence, we find that the District Court's refusal to accept Dr. Blaschke's opinion was critical neither to that court's holding nor to ours. Moreover, the finding of bias was within the court's discretion.
Finally, we reject the State's contention that it lacked actual knowledge of the condition. The need for corrective action was clearly established by John Mustin, the parish maintenance superintendent. He testified that during his routine inspections, he had observed the embankment and trees to the south of La. 5, effectively obstructing the sight line of an eastbound motorist. For these reasons, the State's arguments contesting the finding of an unreasonably dangerous condition and notice thereof lack merit.

Allocation of fault
By its fourth assignment of error the State contends that if this court should affirm the finding of an unreasonably dangerous condition, then the driver's comparative fault of 30% is abusively low and must be increased. As noted above, we accord great deference to the District Court's allocation of fault. Clement v. Frey, supra. In allocating fault, we utilize the now-familiar Watson factors to compare the relative duties of the parties.[4]Watson v. State Farm, 469 So.2d 967 (La.1985). These factors also bear on the causal relationship between the conduct and the harm. Id., at 974.
In the instant case the court cited Watson but gave no further explanation how it applied to the facts. Nevertheless, we perceive no manifest error. Moore's negligent conduct consisted in failing to keep a proper lookout and to stop at the crossing. By contrast, the State's construction and maintenance of La. 5 where it meets the railroad right of way allowed the dangerous condition to exist.[5] Although the record establishes that this rural road enjoys a low volume of motor traffic, and only five or six trains a day, the problem was of long standing. The condition of the vegetation and signing could have been easily addressed. On these facts, we perceive no manifest error in allocating a larger share of fault to the State than to the driver.
The State argues that Moore's fault should be increased because he failed to stop, as required by statute, and because he allegedly disregarded seven different kinds of warning before he reached the crossing. Assuming arguendo the State's hypothesis that Moore was driving extremely slow, 5-8 mph, we agree that this evidences some awareness of the risk, and distinguishes the case from Lee, supra, in which the driver was totally inattentive and cruised into the train at 35 mph. We cannot agree, however, that Moore should be assessed greater fault because he slowed down for a dangerous crossing. The District Court interpreted Moore's conduct as an exercise of caution by slowing down, even though he failed to stop completely.[6] Even with the exercise of caution, he was still hit by the train. His conduct appears commensurate with the danger of the crossing. On this record we cannot declare the allocation of fault to be plainly wrong, manifestly erroneous, or an abuse of the District Court's discretion. This argument lacks merit.

Conclusion
For the reasons expressed, we affirm the judgment of the District Court. Costs of appeal are not assessed. La. R.S. 13:4521.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
*301 CARAWAY, Judge, dissenting.
I respectfully dissent regarding the issue of the allocation of fault.
This case is made difficult due to the deference which must be given to the trial court under Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607. Clement requires the appellate court to defer to the fact finder's measurement of the facts under the Watson analysis for the allocation of fault. even in this case where the trial court does not articulate such facts and discuss their relative weight for a comparison of the negligence of both parties. When I make such analysis under Watson, even with great deference to the trial court and the range of conclusions upon which reasonable people could arrive. I cannot allocate a greater amount of fault upon the State in this instance than the fault which must be attributed to Mr. Moore.
In allocating fault, there is a two-pronged nature to the inquiry. We must consider both the nature of the conduct of each party and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). The now well-recognized five Watson factors are used to assess the nature of the conduct that may influence the degree of fault assigned. In the second aspect of the analysis, the causal relationship between the negligent conduct and the harm must be examined, in light of concepts such as last clear chance, for a determination of the actors' direct or indirect causative impact upon the accident. Watson, supra at 974; Daye v. General Motors Corp., 29,118 (La.App.2d Cir. 5/21/97), 712 So.2d 120, reversed on other grounds, 97-1653 (La.9/9/98), 720 So.2d 654.
Moore's negligent conduct was his failure to keep a proper lookout and to stop at the crossing. The State's construction and maintenance of Highway 5 and its right-of-way caused a dangerous trap to exist. In measuring the nature of Moore's conduct, weight must be given to his familiarity with Highway 5 and the crossing and to the clear and dry conditions existing on the morning of the accident. As to the State, the extremely low usage of the rural road and the lack of any recent history of accidents[1] are factors which have been given significant consideration in similar settings. See, Lee v. Missouri Pacific R.R. Co., 540 So.2d 287 (La.1989); Rick v. State, Dept. of Transp. and Development, 93-1776 (La.1/14/94), 630 So.2d 1271; Arnold v. Illinois Cent. Gulf R.R., 501 So.2d 778 (La.App. 1st Cir.1986). I also find significant the fact that this railroad crossing, as with every crossing, is a shared responsibility of the highway authority and the railroad whose right-of-ways may combine together to form an unreasonably dangerous trap. See cases allocating fault to the railroad, Lee, supra; Rivere v. Union Pacific R. Co., 93-1132 (La. App. 1st Cir. 10/7/94), 647 So.2d 1140, rehearing denied. writ denied 95-0292 (La.3/24/95), 651 So.2d 295; Shaffer v. Illinois Cent. Gulf Railroad Co., 479 So.2d 927 (La.App. 1st Cir.1985). In this instance, the condition of KCS's right-of-way, enclosed by an embankment and a brush-lined fence, was as much or more of a factor in this accident than the State's right-of-way.
From the above, three of the five Watson factors[2] would have application in this case. Both parties were aware of the risk in a somewhat similar manner, as Moore and the State's highway inspector routinely passed through the intersection. The conduct of the State in negligently constructing and maintaining this stretch of Highway 5 and Moore's actions of failing to stop at the intersection each involved a serious risk of injury, a vehicle colliding with a train. The third applicable factor. comparing the superior or inferior capacities of the actors, is likewise not a significant factor in distinguishing the conduct of both parties in this instance except to the extent that this factor is similar to the second prong of the Watson analysis *302 which deals with the causal relationship between the negligent conduct and the harm.
It is this second aspect of the Watson analysis that I find most telling in this particular case. In this analysis, one fact is critical. It is undisputed by the parties that as Moore approached the crossing, he had slowed his vehicle down to five to eight miles per hour, virtually to the point of stopping. The testimony indicated that this was in accordance with his routine pattern in traveling through the crossing. Additionally, there was no evidence of skid marks at the intersection.
The low speed of Moore's vehicle therefore indicates that, unlike the driver in Lee, who was totally inattentive and became caught in the trap created by the angled intersection, unable to stop at a speed in excess of 35 miles per hour, Moore averted to the potential danger of the crossing. In the last 65 feet before the intersection where the sightline became unobstructed, the opportunity to safely stop the vehicle at that speed remained present at a time when the motorist could be alerted by the movement of the train. This last conduct by Moore in significantly slowing the vehicle down thus makes his failure to see the train, in the words of Watson, a more direct "causative impact on the accident." Like the child in Watson who fired the weapon killing the hunter who neglected to wear the hunter orange vest, Moore was the last actor who averted to the danger by slowing down. The causal relationship between his negligent failure to see what he could have seen and the collision is a more direct one.
Under the Watson analysis, I therefore would hold that under any reasonable evaluation of the facts of this case. the weight of the responsibility upon Moore to see and respond to the train at the very slow speed which he was traveling becomes the decisive factor for apportioning the parties' fault. Accordingly, the trial court and the majority's assessment of the State with the greater portion of the fault in this instance is in error.
NOTES
[1] At oral argument plaintiffs' counsel conceded that Moore may have been driving 5-8 mph at the time of impact.
[2] Joseph Moore subsequently moved to dismiss the appeal on grounds that he had reached an agreement with State; the State, by reply brief, conceded this, acknowledging its "intention" to settle the matter. Because we have not received final confirmation of settlement, we will render judgment in both cases.
[3] The State's second assignment of error contests the District Court's refusal to accept the testimony of the State's expert, Dr. Joseph Blaschke. We address this later in the opinion.
[4] These include: (1) Whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) How great a risk was created by the conduct; (3) The significance of what was sought by the conduct; (4) The capacities of the actor, whether superior or inferior; and (5) Any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
[5] The State urges merely that Moore's 30% allocation should be increased. It does not contend that its own fault should be diminished for any fault attributable to KCS. It also does not argue that the 1996 amendments to La. C.C. art. 2323 or the recent Supreme Court opinion in Keith v. United States Fid. & Guar. Co., 96-2075 (La.5/9/97), 694 So.2d 180, would permit the assessment of non-party fault.
[6] Completely stopping at a railroad crossing may actually be more hazardous. See Pokora v. Wabash Ry. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149 (1934), limiting Baltimore & Ohio R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167 (1927).
[1] The evidence also indicated that the last accident prior to this fatal collision occurred fifteen years earlier.
[2] The three applicable factors are (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct; and (3) the capacities of the actor, whether superior or inferior. I do not believe the Watson factors of the significance of what was sought by the conduct or any extenuating circumstances have relevance in this particular case.