# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 04-469


**JESSICA RENEE DOUCET BOULEY, ET AL.**

**VERSUS**

**DENNIS GUIDRY, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-746-97
HONORABLE WENDELL R. MILLER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


## BILLY HOWARD EZELL
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Jimmie C. Peters, Glenn B. Gremillion, and Billy Howard Ezell, Judges.

**AFFIRMED AS AMENDED.**

**Randall Kurt Theunissen**
**Allen & Gooch**
**P. O. Drawer 3768**
**Lafayette, LA 70502**
**(337) 291-1240**
**Counsel for: Defendant /Appellee**
**State of Louisiana, thru the Department of Transportation and Development**

**Kaliste Joseph Saloom, III**
**Saloom & Saloom**
**Post Office Drawer 2999**
**Lafayette, LA 70502-2999**
**(337) 234-0111**
**Counsel for: Plaintiff/Appellant**
**Jessica Renee Doucet Bouley, Individually**

**Kraig Thomas Strenge**
**Attorney at Law**
**P.O. Box 52292**
**Lafayette, LA 70502-2292**
**(337) 261-9722**
**Counsel for: Defendants/Appellees**
**Illinois National Insurance Company**
**Dennis Guidry**

**EZELL, JUDGE.**

Jessica Bouley, a passenger in a vehicle involved in a single-car accident, appeals a trial court judgment which found her comparatively at fault for the quadriplegia she suffered as a result of the accident. In addition to disagreeing with the trial court's allocation of fault to her, Bouley also claims that the trial court erred in finding that the Louisiana Department of Transportation and Development (DOTD) was not at fault for a defective ditch slope on U.S. Highway 90 in Jefferson Davis Parish.

## FACTS

On October 20, 1996, Bouley traveled with an acquaintance, Dennis Guidry, on an outing that would change her life forever. The trip began at approximately 2:30 in the afternoon when Guidry picked up Bouley to go riding with him in his car, a 1977 Buick LeSabre. They drove around Lake Arthur, Louisiana, for a while and purchased some beer. Bouley had some Xanax, and she and Guidry took at least one. They then proceeded to Jennings toward Lake Charles where they purchased more beer. At this time, the pair decided to go to Beaumont, Texas, where they went to the apartment of a male friend. Guidry testified that they went to a couple of bars in Beaumont before leaving the friend's apartment around midnight, but Bouley claims they left for home after staying a couple of hours at the friend's apartment and never went to any bars. At some point, Bouley got in the back seat of the vehicle and laid down with her head on the passenger side. There is also a dispute between their versions as to when the decision was made, but it was decided that they would go to a friend's house in Welsh, Louisiana. This is how the vehicle came to be traveling eastbound on Highway 90 in the early morning hours on October 21.

1

Guidry testified that he was getting tired, fatigued, and aggravated. He could not recall if he was dozing when the accident occurred. Initially, the car left the roadway on the right-hand side of the highway. Guidry testified that he tried to pull back onto the highway but the car came back on the roadway quickly, jumped lanes, and exited the left side of the road. Guidry testified that he tried to pull the car back onto the highway but the car eventually hit the bottom of the ditch, making a 180-degree turn, causing injury to Bouley's spine at level C5-C6.

Trooper Waylan James Busby investigated the accident on the night it happened. He was called at 2:32 in the morning when it was dark but the weather was clear. Trooper Busby observed the vehicle in the north ditch facing west on Highway 90. He measured twenty feet from the point of impact to the location where the vehicle came to rest. There were no skid marks visible. He did notice tire marks on the north side of the driveway. The marks proceeded over the driveway and then the vehicle struck the ditch. The only damage to the vehicle was on the front bumper.

In interviewing Guidry, Trooper Busby observed a strong smell of alcohol on Guidry's breath. Guidry was also swaying, unsure of his balance, and fell while talking to Trooper Busby. After Guidry completed a field sobriety test, a Breathalyzer test was administered to Guidry twice at the Jefferson Davis Parish Sheriff's Office around 3:57 a.m. The first time the results were below .10, but the second time the results were .10. Guidry was then charged with DWI.

As a result of the accident, Bouley was rendered a quadriplegic with only minimal use in her right hand. Dr. Ralph Brown who treated Bouley after the accident explained that the force from the car spinning 180- degrees caused Bouley's neck injury. Guidry was not injured in the accident but was issued a DWI after failing the second Breathalyzer.

2

Bouley filed suit against Guidry and the DOTD. After hearing the testimony and reviewing the evidence, the trial court entered judgment allocating fifty percent of the fault for the accident each to Bouley and Guidry. Bouley was awarded $561,415.52 for past medical expenses and $2,808,329.00 for future medical expenses. She received $772.50 for loss of past earnings but no award was made for loss of future earnings. General damages were awarded in the amount of $1,500,000.00. Each of Bouley's three children also received $100,000.00.

Bouley appealed the judgment, asserting that the trial court erred in several respects. These include allocating fault to Bouley for failing to wear a seat belt, failing to allocate fault to the DOTD, and failing to award Bouley damages for future lost wages.

## BOULEY'S FAULT

In finding Bouley fifty percent at fault for the accident the trial court orally stated that she had to bear some responsibility for her injury for not wearing her seat belt, which it considered a major factor in her injury based on Dr. Brown's testimony. Dr. Brown testified that Bouley was exposed to this type of neck injury because she was lying on the seat with no seat belt.

Louisiana Revised Statutes 32:295.1(E) clearly does not permit evidence of the failure to wear a seat belt as evidence of comparative negligence in causing injury. *See Rougeau v. Hyundai Motor Am.*, 01-1182 (La. 1/15/02), 805 So.2d 147. Therefore, the trial court erred in using this evidence to apportion any fault to Bouley. However, it appears the trial court did take other factors into consideration in assessing Bouley with fault, although not as heavily. Since there are issues concerning the failure to assess the DOTD with any fault, we will reserve our reassessment of fault until later in the opinion.

3

**FAULT OF DOTD**

Each side presented the testimony of an expert witness regarding the cause of the accident and resulting injury to Bouley. At issue was the slope of the ditch that Guidry encountered when his vehicle veered off the road to the left on the north side of Highway 90. Bouley claims that the trial court erred in relying on DOTD's expert's testimony and in finding that *Cormier v. Comeaux*, 98-2378 (La. 7/7/99), 748 So.2d 1123 applied. Bouley argued that the fore slope of the ditch where the vehicle crashed was 2:1, which was unreasonably dangerous, and was the cause in fact of the vehicle's failure to recover, causing her injuries.

*Cormier* involved a claim arising out of an accident on Highway 90, one mile east of Mermentau, Louisiana. The accident also occurred in the early morning hours when the driver of the vehicle drove his vehicle off the road, across the shoulder and an adjacent roadside ditch, and into the back embankment of the ditch. The car rolled over and came to rest in the ditch facing north. The driver and a passenger were rendered quadriplegics as a result of the accident. The supreme court stated that the prime issue was whether the road was defective because the back slope created an unreasonable risk of harm. We do not find that the trial court's reliance on *Cormier* is misplaced. Both cases involved the same highway and very similar conditions. The trial court did not rely on *Cormier* in coming to the conclusion that Highway 90 in the particular spot where the Guidry vehicle impacted with the ditch was not unreasonably dangerous. Its oral reasons for judgment clearly indicate that the trial court based its judgment on the evidence as presented to it in this case. *Cormier* was merely used as guidance by the trial court. Therefore, we will review the trial court's determination that the slope of the ditch was not an unreasonably dangerous condition.

4

"As to the area off the shoulder of the road, but within the right of way, DOTD owes a duty to maintain the land in such a condition that it does not present an unreasonable risk of harm to motorists using the adjacent roadway or to others, such as pedestrians, who are using the area in a reasonably prudent manner." *Id*. at 1127. "Whether the condition of a road is unreasonably dangerous is a question of fact and should only be reversed if it is manifestly erroneous or clearly wrong." *Petre v. State, Dep't of Transp. & Dev.*, 01-876, p. 7 (La. 4/3/02), 817 So.2d 1107, 1111. "When applying a manifest error or clearly wrong standard, even if an appellate court may feel that its own evaluations and inferences are as reasonable as those of the district court, it should not disturb the findings of the district court." *Id*.

Dean Tekell testified on behalf of Bouley as an expert in the field of traffic engineering, highway design engineering, and accident reconstruction. Tekell had worked for the City of Lafayette as chief traffic engineer during which time he often investigated accidents. Tekell began working on his own in 1998, having previously testified in court about six times. Tekell explained that he used a slope meter to measure the slope of the ditch. Tekell testified that he measured fifty feet on each side of the driveway and tried to pick out what appeared to be an average slope across the sections. He did not pick out the steepest or shallowest slope. His most significant finding in the area of the accident was that the fore slope of the ditch was 2:1, meaning that for every two feet of horizontal distance, the bank rises up one foot. The back slope was 4:1. Tekell testified that the slighter the slope, the less likely the vehicle is to flip or make some other type of erratic maneuver. The 1952 construction plans for widening this area of Highway 90 indicated that the slope should be 3:1. Tekell opined that the driver's side of the vehicle plowed into the bottom of the ditch and once it plowed up enough earth to build up resistance, the back end of the vehicle

5

whipped around. Tekell testified that this reaction of the vehicle was caused by the 2:1 slope and the vehicle would have reacted much differently on a 3:1 slope.

Don Ivey testified on behalf of the DOTD as an expert in highway safety engineering with an accident reconstruction facet. At the time of trial, Ivey had testified in courts in several states for thirty years and had authored over 100 refereed articles during his career. He determined the slope of the ditch by plotting the elevation contours of the site. His measurements indicated that the average fore slope was 3:1. Ivey agreed that the slope was 2:1 in a spot but stated that it was not in the general cross section. He explained that it was near the ditch where the slope has to change to accommodate the slope at the end of the culvert by the driveway.

Tekell agreed that at the time Highway 90 was widened, a 3:1 slope would have been an acceptable slope. Neither expert noticed any defect in the highway which would have caused the vehicle to leave the road.

The trial court was faced with two different measurements of the fore slope of the ditch taken by two different methods. We cannot say its reliance on Ivey's measurements was in error. As explained by the trial court, it believed the methodology used by Ivey was more likely to give an accurate average slope for the ditches in this area of Highway 90. Since we find no error in the trial court's acceptance that a 3:1 fore slope existed, there is no evidence that an unreasonably dangerous condition existed. Therefore, we find no error in the trial court's failure to assess the DOTD with any fault. We must therefore apportion fault between Bouley and Guidry.

As we previously stated, the trial court found Bouley at fault principally because she did not wear her seat belt, which assessment of the law does not permit. However, the trial court also explained that it was assessing Bouley with some of the

6

fault because she provided alcohol and drugs to Guidry, which it found to be a factor in causing the accident.

> A guest passenger in an automobile has no duty to supervise the driver. However, if alcohol-induced impairment of the driver is a substantial cause of the driver's negligence and if the guest passenger knows or should have known of the driver's impaired condition and, nevertheless, voluntarily rides with him, the guest passenger may be found comparatively negligent or at fault.

*Carbon v. Allstate Ins. Co.*, 96-2109, p. 14 (La.App. 1 Cir. 9/23/97), 701 So.2d 462, 471, *rev'd on other grounds*, 97-3085 (La. 10/20/98), 719 So.2d 437.

"After the court of appeal finds a 'clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Clement v. Frey*, 95-1119, 95-1163, pp. 7-8 (La. 1/16/96), 666 So.2d 607, 611. The supreme court has provided some factors to guide us in determining what is the highest percentage of fault we can assess to Bouley in lowering the amount awarded by the trial court.

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985).

The trial court found that Guidry was an impaired driver who fell asleep and left the highway. In reading the trial court's oral reasons for judgment, it is clear that any fault it placed on Bouley for providing alcohol and drugs to Guidry and riding with him in this condition was minimal. The testimony reveals that Guidry was not

7

coerced by Bouley into taking these substances but did so freely. At the actual time of the accident, Bouley was asleep, so she had no way of knowing if Guidry was dozing off as he was driving or having problems driving. We agree with the trial court that any negligence on the part of Bouley for riding with a driver under the influence was minimal, and the highest amount of fault that could be placed on her is five percent. Therefore, we allocate the other ninety-five percent of fault to Guidry.

## LOSS OF FUTURE EARNINGS

Pursuant to a motion for voluntary dismissal of Bouley's claims for lost future wages, the trial court ruled that Bouley had failed to prove by a preponderance of the evidence she was entitled to any award for future loss of wages. Although Bouley admits her past work history was sporadic, she points to the fact that she was working at the time of the accident, had held other jobs off and on, and would have probably worked in the future also.

> Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident.
>
> In determining the proper amount to be awarded, the trier of fact should consider the injured person's age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Our review of this award is governed by the manifest error standard. "The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record."

*Myers v. Broussard*, 96-1634, pp. 18-19 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 98 (citations omitted).

8

Wendell Aguillard testified at trial about Bouley's employment with him at the time of the accident. He testified that he hired Bouley about two months before her accident for farmstead upkeep. She would mow the roads around the farm, buildings, shop, dryer, and house, which encompassed twenty-three acres. He paid her minimum wage, and Bouley would work six hours a day, five days a week. Bouley would also drive Mrs. Aguillard wherever she needed to go. Aguillard found Bouley to be a very reliable and trustworthy employee. Aguillard did testify that the job was temporary and that once the grass did not need cutting, he would no longer need Bouley's services.

Bouley testified that prior to her job with Aguillard, she had not had steady employment but had worked as a waitress at a couple of restaurants in addition to working at the Kaplan Sewing Factory before she worked for Aguillard. However, there was no documentary evidence to support this.

At the time of the accident, Bouley was a healthy, thirty-three year old. She dropped out of high school just short of her graduation. Given her lack of education, Bouley's prospects of finding any employment as a quadriplegic are practically hopeless. No one questions the fact that she will never be able to work. However, we find it unreasonable to think that Bouley would never have worked some time during her remaining work-life. Bouley did demonstrate that she worked, even if it was sporadic. Bouley does not try to argue that she would ever earn anything other than minimum wage. We find it was error for the trial court to fail to award Bouley some amount for loss of future earnings.

The reports of two economists were introduced into the record. Dr. Bernard Pettingill projected Bouley to have a work-life expectancy beyond trial of 26.8 years and based his calculation of loss of future wages on earnings of $150.00 a week, or

9

$7,800.00 a year. He found the present value of her loss of future wages to be $169,074.00.

Dr. Kenneth Boudreaux calculated Bouley's work-life expectancy at 15.01 years as of the date of trial. He also used a calculation of $7,800.00 a year as Bouley's annual income. He calculated the present value of her loss of income at a low rate of $87,503.02 and a high rate of $99,518.84.

We find that an award of $87,503.02 for future loss of wages is supported by the evidence. We will amend the judgment accordingly.

For the foregoing reasons, the judgment of the trial court is amended to find that Jessica Bouley is five percent at fault for the accident and Dennis Guidry is ninety-five percent at fault for the accident. The judgment is also amended to award $87,503.02 for future loss of wages to Bouley. In all other respects the judgment is affirmed. Costs of this appeal are assessed to Dennis Guidry.

**AFFIRMED AS AMENDED**.