# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-230


TESSICA SPEARS, ET AL.

VERSUS

CITY OF SCOTT, ET AL.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2001-2238,
HONORABLE PATRICK L. MICHOT, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


## REVERSED IN PART, AMENDED IN PART, AND RENDERED.

Barton W. Bernard
Philip C. Kobetz
Attorneys at Law
120 Representative Row
Lafayette, Louisiana 70508
(337) 593-1123
Counsel for Plaintiff/Appellant/Appellee:
    Tessica Spears

Peter C. Piccione, Jr.
Attorney at Law
Post Office Box 5150
Lafayette, Louisiana 70502-5150
(337) 234-1132
Counsel for Plaintiffs/Appellants/Appellees:
    Barbara Autin
    David Autin

**Paul A. Holmes**
**J. Scott Thomas**
**Rodd Anthony Naquin**
**Attorneys at Law**
**700 North Tenth Street**
**Baton Rouge, Louisiana  70821**
**(225) 344-5001**
**Counsel for Defendants/Appellees/Appellants:**
      **Louisiana Municipal Risk Management**
      **Jerry D. Braun**
      **City of Scott**

SULLIVAN, Judge.

This case involves a collision between an unmarked police vehicle and another vehicle at the intersection of Rue de Belier Road and West Congress Street in Lafayette. After a trial on the merits, the trial court assessed 50% fault to each driver and awarded damages. All parties appeal. For the following reasons, we reverse the assessment of fault to Plaintiff and increase the damages awarded as set forth herein.

### *Facts*

At approximately 7:45 a.m. on September 18, 2000, Jerry Braun, a detective with the Scott Police Department, was driving to his office in an unmarked vehicle. While driving, he heard a dispatch call to Scott Police Officer Deon Bearb to respond to a fight in progress. Detective Braun was not assigned to go to the scene, but he called the dispatcher and advised that he was responding to assist Officer Bearb. He testified that he did this because Detective Bearb was working by himself that morning. As he responded, Detective Braun activated his emergency lights and siren. He testified that the siren is automatically activated when the emergency lights are turned on and that the siren speaker on an unmarked unit is under the hood of the vehicle.

Detective Braun testified that he approached the intersection in the northbound lane of Rue de Belier. There was traffic in the northbound lane and the left turn lane; it was stopped for the traffic light which was red. As he got closer to the intersection, Detective Braun moved into the turn lane. After making sure no traffic was in the southbound lane, he moved into that lane and drove around the traffic in front of him.

A bread truck was first in the left turn lane. When Detective Braun arrived at the intersection, the light was still red for the northbound traffic on Rue de Belier. He testified that, when he was adjacent to the bread truck, he went into the

intersection at a forty-five-degree angle in front of the bread truck and came to a complete stop, explaining that he went into the intersection at an angle so westbound traffic could see his lights. At that point, he stopped and looked both ways to make sure no cars were coming and the intersection was clear. After he stopped, he proceeded into the intersection and was broadsided by a vehicle driven by Barbara Autin. Detective Braun testified that Ms. Autin's vehicle was not in the intersection when he entered it.

Ms. Autin testified that she was traveling west on West Congress. Before she entered the intersection, she heard a "faint" siren. She testified that she slowed down when she heard the siren. She heard the siren two to three seconds before she entered the intersection and heard it until the accident occurred, but it sounded "far away"; she could not tell where it was coming from. Ms. Autin testified that she had time to look to her left and right only once for an emergency vehicle because she was so close to the intersection, explaining: "I heard the siren and looked from side to side. I glanced very quickly to make sure there was nothing coming. I did not see anything; my path was clear so I proceeded through the intersection and the accident occurred." She further testified that she did not see anything but the bread truck.

Regarding Detective Braun's testimony that he parked his vehicle in front of the bread truck, Ms. Autin testified that she would have seen his vehicle and would have stopped, if he had parked in the manner he described. She also testified that, after Detective Braun got out of his vehicle, he raised his hands, said that he was sorry and the accident was his fault.

When Ms. Autin heard the siren, she asked her daughter, Tessica Spears, a passenger in her vehicle, if she heard it. Ms. Spears testified she heard "a faint siren,"

2

which she thought was "miles away." She "had no idea where the siren was coming from." She looked around for the source of the siren until they entered the intersection but did not see anything before the collision occurred. Ms. Spears heard the siren two to three seconds "at the most" before the collision. She testified that she did not see anything but the bread truck in the intersection and that she did not see Detective Braun's vehicle until the collision.

Jude Landry was driving behind Ms. Autin as she approached the intersection. He testified that he did not hear a siren before the accident. He described the accident as occurring in a "flash." He did not believe Detective Braun yielded before entering the intersection because the accident happened so fast. Mr. Landry testified that, from his point of view, it appeared as though Detective Braun moved from the northbound turn lane into the southbound lane and accelerated as he went around the bread truck.

Ronnie Trosclair was the driver of the bread truck stopped in the northbound turn lane at the intersection. He testified that he heard a siren but "couldn't figure out where it was coming from." He did not notice the unmarked police car or the siren getting louder until it was along the side of his vehicle. He turned and looked to his left when Detective Braun was next to his vehicle. It was not until then that he realized where the siren was coming from.

Mr. Trosclair testified that Detective Braun did not stop at the intersection, but slowed to a rolling stop. Mr. Trosclair further testified that, when the right front passenger seat of Detective Braun's vehicle was between the window and the front of his bread truck, Detective Braun "punched it" and drove into the intersection. He denied that Detective Braun positioned his vehicle at a forty-five-degree angle in

3

front of his truck and stopped. He also testified that he did not believe Detective Braun could see around his truck when he accelerated into the intersection. However, on questioning by the trial judge, he agreed that he did not know if, from his vantage point, Detective Braun could see clear of his truck.

After the accident, Mr. Trosclair told Detective Braun that Ms. Autin never saw him because of his bread truck. He testified that Detective Braun responded the accident was his fault because the driver of the other car never saw him.

Van Romero was standing in the parking lot of the Acadiana Food Mart which is in the northwest quadrant of this intersection. He testified that the siren on Detective Braun's vehicle was not muffled and that he had no problem hearing it. He further testified that Detective Braun's emergency lights on the dash of the car and its "wigwag" headlights were on. Mr. Romero testified that he saw Detective Braun come around the bread truck and come to a complete stop so he could see any vehicles entering the intersection. He also testified that the hood ornament on Detective Braun's vehicle was pointing at Ms. Autin's lane of travel. In his opinion, Detective Braun stayed parked long enough to make sure no traffic was coming through the intersection before he entered it. He also stated that the front of Detective Braun's vehicle was beyond the bread truck when it stopped. However, on cross-examination, Mr. Romero admitted that in his statement to the investigating police officer he stated that Detective Braun came to a stop *at the intersection* for the red light, *not in front of the bread truck*.

Mr. Romero testified that he did not see any traffic moving into the intersection as Detective Braun took off from his stop. He further testified that he did not see Ms. Autin's vehicle until two seconds before the accident occurred, explaining:

4

"when the police officer came across the intersection, I was following his car and she was right there, and they hit."

Michael Barrett was also standing in the parking lot of the Acadiana Food Mart when the accident occurred. He testified he heard a police siren coming from the south and saw a dark-blue Crown Victoria approaching the intersection with its emergency lights on; the vehicle stopped and angled toward the intersection. He testified that the vehicle stopped even with the white stop line for the left turn lane of the northbound traffic on Rue de Belier. He explained that the Crown Victoria was "kind of" angled toward the eastbound traffic, but it was not a big angle. He further testified that the vehicle was waiting for traffic to stop, and once the traffic stopped, it proceeded into the intersection. He saw Ms. Autin's vehicle when she was near the stop line for the westbound traffic on Congress Street.

The trial judge assessed 50% fault each to Detective Braun and to Ms. Autin and made the following findings regarding the allocation of fault:

> The evidence showed that [Detective Braun's] lights and siren [were] on. There was conflicting evidence as to whether he came to a complete stop prior to entering the intersection. He did admit that he did not continue to look left and right as he crossed the intersection once he ascertained it to be clear.

> Ms. Autin testified that she did hear the siren, as did her daughter, Tessica. Yet she proceeded through the intersection without ascertaining where the siren was coming from and if it was safe to proceed through the intersection in violation of case law concerning vehicle procedure in that type of situation.

> When Ms. Autin saw the bread truck at the intersection she should have looked back again to insure that the policeman was not being blocked by the truck. She did hear the siren, but she failed to do so.

Damages were awarded to Ms. Autin, her husband, Ms. Spears, and Ms. Spears's son. All parties appeal.

5

### *Standard of Review*

In *Bonin v. Ferrellgas, Inc.*, 03-3024 (La. 7/2/04), 877 So.2d 89, the supreme court reiterated that the standard of review on appeal is the manifest error standard. In order for an appellate court to reverse a finding by the fact finder, it must review the entire record and find that "a reasonable factual basis does not exist for the finding" and that "the record establishes that the fact finder is clearly wrong or manifestly erroneous." *Id.* at 94-95. It is not the appellate court's role to "re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." *Id.* at 95. Instead, the appellate court "must give great weight to factual conclusions of the trier of fact." *Canter v. Koehring,* 283 So.2d 716, 724 (La.1973). Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed where there is conflicting testimony or other evidence, even if the appellate court "may feel that its own evaluations and inferences are as reasonable." *Id.*

Courts of appeal have a constitutional duty to review facts. To perform this duty properly, appellate courts must determine whether the trial court's conclusions were "clearly wrong based on the evidence or clearly without evidentiary support." *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, 93-3110, 93-3112, pp. 8-9 (La. 7/5/94), 639 So.2d 216, 221. We remain mindful that "when two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Bonin*, 877 So.2d at 95.

***Discussion***

***Allocation of Fault***

Plaintiffs and Defendants urge that the trial court erred in its allocation of fault. In suits for personal injury, Louisiana Civil Code article 2323 requires the trier of fact to determine "the degree or percentage of negligence of all persons causing or contributing to the injury." On appeal, the trier of fact's allocation of fault is entitled to great deference and should be affirmed unless it is manifestly erroneous or clearly wrong. *Gregor v. Argenot Great Cent. Ins. Co.,* 02-1138 (La. 5/20/03), 851 So.2d 959.

In *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La.1985), the supreme court held that the trier-of-fact must consider both the nature of the conduct of all parties and the extent of the causal relationship between the conduct and the damages claimed when allocating fault. The court outlined the factors which may influence the degree of fault assigned:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

Drivers of authorized emergency vehicles are granted privileges when responding to emergencies, if certain conditions are met. La.R.S. 32:24 provides in pertinent part:

> A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or

7

suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.

B. The driver of an authorized emergency vehicle may:

. . . .

(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation;

. . . .

C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals **sufficient to warn motorists of their approach**, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

(Emphasis added.)

In *Lenard v. Dilley*, 01-1522 (La. 1/15/02), 805 So.2d 175, the supreme court held that La.R.S. 32:24 contains two alternate standards of care depending on the circumstances. If the requirements of Subsections (A), (B), and (C) of the statute are met, an emergency vehicle driver can only be held liable for actions which constitute "reckless disregard for the safety of others," i.e., gross negligence. *Id.* at 180. If these requirements are not met, an emergency vehicle driver is gauged by an ordinary standard of "due care." *Id*.

Initially, we observe that the trial court did not err in determining that Detective Braun was properly responding to an emergency call to which the provisions of La.R.S. 32:24 were applicable. However, we find that the requirements of Subsection (C) of La.R.S. 32:24 were not met. Subsection (C) requires the audible signal of an

8

emergency vehicle to be "sufficient to warn motorists of their approach." While Ms. Autin heard Detective Braun's siren, it was "faint" and sounded "far away." Neither she nor Ms. Spears could determine where the siren was coming from; Mr. Trosclair did not realize where the siren was coming from until Detective Braun was along side his vehicle at the intersection; and Mr. Landry never heard a siren.

Mr. Romero and Mr. Barrett testified that they heard the siren clearly. However, they were not inside vehicles, and they were on the same side of the intersection and the traffic as Detective Braun. Their ability to hear Detective Braun's siren was not affected by being inside an enclosed vehicle. More importantly, the sight and sound of Detective Braun's vehicle were not blocked by the northbound traffic at the intersection, which included Mr. Trosclair's bread truck, a twelve foot high, sixteen foot long vehicle.

None of the motorists who heard Detective Braun's siren could determine its location. The "faint" sound of Detective Braun's siren was not sufficient to warn Ms. Autin or other motorists of his immediate approach to the intersection. Therefore, it did not meet the requirements of La.R.S. 32:24(C), and the standard applicable to Detective Braun's actions is ordinary negligence.

Even if Detective Braun's siren was sufficient under Subsection (C), we find his actions constituted gross negligence. Subsection (B)(2) of La.R.S. 32:24 allows the driver of an emergency vehicle to proceed past a stop signal, but only after slowing down or stopping "*as may be necessary for safe operation.*" The trial court found that Detective Braun "punched" it after coming to a rolling stop at the intersection and that he did not continue to monitor traffic when he entered the intersection, even though he was traveling through the intersection against a red light.

9

Detective Braun testified that he did not enter the intersection until he knew that all traffic at the intersection stopped and that he never saw Ms. Autin's vehicle before he entered the intersection. The evidence established that there was one westbound vehicle stopped at the intersection when Detective Braun entered the intersection. That vehicle was in the left turn lane, waiting to turn south onto Rue de Belier. There were two other lanes in which westbound traffic approaching the intersection could have been traveling. Detective Braun knew that westbound drivers approaching the intersection could not see his vehicle behind the bread truck and initially approached the intersection with caution. However, he abandoned that caution once he entered the intersection. His failure to continue monitoring the traffic, coupled with his acceleration into the intersection, constituted gross negligence.

The trial court concluded that Ms. Autin proceeded through this intersection in violation of the law because she did so without determining where the siren was coming from. A driver is required to pull over and stop "upon the immediate approach of an authorized emergency vehicle." The siren on Detective Braun's vehicle did not warn Ms. Autin that an emergency vehicle was immediately approaching the intersection; therefore, she was not obligated to yield the right-of-way to Detective Braun as provided in La.R.S. 32:125.

The trial court also faulted Ms. Autin for proceeding through the intersection without looking to insure the emergency vehicle was not blocked by the bread truck. A diagram of the accident scene shows the point of impact in Ms. Autin's lane of travel less than midway into the intersection. Based on Mr. Trosclair's testimony, which the trial court accepted, that Detective Braun accelerated as he entered the

10

intersection and Ms. Autin's testimony that she only had time to look left and right once before entering the intersection, the evidence does not establish that Ms. Autin could have done anything to prevent the accident if she had looked at Mr. Trosclair's bread truck once she entered the intersection.

Applying the factors identified in *Watson*, we conclude the trial court's allocation of fault was clearly wrong. With regard to whether the conduct resulted from inadvertence or involved an awareness of the danger, Detective Braun realized the danger presented by his entering the intersection against the red light and the bread truck's presence to drivers entering the intersection as opposed to Ms. Autin who did not realize that the "faint" siren which sounded "far away" was approaching the intersection. Detective Braun abandoned his caution for the situation when he entered the intersection instead of increasing it as the situation warranted.

The risk created by Detective Braun's actions was great. He knew his visibility was blocked by the northbound traffic, especially the bread truck at the intersection, and he should have anticipated that the sound of his siren was also blocked by the traffic. Even though he knew traffic approaching from the west could not see him, he did not come to a complete stop and his testimony regarding where he allegedly stopped at the intersection is disputed by all three witnesses who testified on that issue. We find the risk created by Detective Braun's actions was greater than Ms. Autin's actions in failing to pull aside upon hearing a "faint" siren because she was unable to appreciate the potential danger of the situation.

The third *Watson* fact is the significance of what was sought by the conduct. Detective Braun was responding to assist another officer; however, the evidence established that another officer had been dispatched to assist Officer Bearb.

Therefore, any need for his assistance was not urgent. Ms. Autin was driving her grandson, Kyle, to school. We find that Detective Braun's response to assist Officer Bearb was initially of greater significance than Ms. Autin's driving Kyle to school. However, that significance was greatly reduced before the accident occurred.

Detective Braun was clearly in a superior position to understand the risks presented in the situation because he realized a westbound driver's ability to determine his location at the intersection was impeded by the northbound traffic and the location of the bread truck. He was responding to an emergency, but, as previously noted, another officer had been dispatched to assist Deputy Bearb. Therefore, no extenuating circumstances existed which justified Detective Braun's proceeding through the intersection without exercising proper caution for the safety of the traffic in or approaching the intersection.

Based on our consideration of these factors and the actions of the parties in relation thereto, we reverse the allocation of 50% fault to Ms. Autin and reduce it to 0%, relieving her from fault.

The City of Scott cites *Matthews v. Maddie*, 01-1535 (La.App. 1 Cir. 6/21/02), 822 So.2d 739, *writ denied*, 02-2420 (La. 11/22/02), 829 So.2d 1052, and argues that Detective Braun's actions did not amount to gross negligence. The ambulance driver in *Matthews* eased his emergency vehicle into the intersection, driving only two to three miles per hour, whereas Detective Braun sped into the intersection without maintaining a lookout for oncoming traffic. *Matthews* does not support the City of Scott's position.

12

### *Damages*

The Autins assign as error their respective awards for loss of consortium and pain and suffering. Ms. Spears also assigns as error some of her damage awards. When reviewing general damage awards, an appellate court is not to decide what it considers to be an appropriate award. Instead, the court is to review the exercise of the discretion by the trier of fact. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). If there is no clear abuse of discretion, the awards must stand. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

### *The Autins*

Ms. Autin urges that the trial court's general damage award of $5,000.00 for her injuries was abusively low. As a result of the collision, the airbags in her car were activated, causing a burn on one of her arms. She had to pop her airbag to put her gearshift in park and turn off her vehicle's ignition. When she did, the powder in the airbag created the illusion of smoke, causing her to believe her car was on fire while Ms. Spears and Kyle were still in their seats. She struggled to get herself and Kyle out of the car and to assist Ms. Spears who was screaming. She did not realize the car was not on fire until after she got Kyle out of the car and was attempting to assist Ms. Spears.

Ms. Autin was transported to the hospital by ambulance where she was treated in the emergency room. Thereafter, she saw Dr. Patrick A. Sonnier, complaining of pain in her ribs, hips, legs, lower back, neck, and right groin area. She testified that the use of her right arm was very limited due to soreness and pain. After the accident, she could not do anything because she hurt and was stiff and sore all over. She was

13

unable to lie down and had to sit in her recliner most of the time. She was unable to engage in sexual relations with Mr. Autin. Her youngest daughter got married in October 2000. She had planned to prepare the food and decorations for the wedding but was unable to do so.

Ms. Autin attended physical therapy as prescribed by Dr. Sonnier over a period of five months for her neck and shoulder pain which persisted after her initial treatment by Dr. Sonnier. At first, the physical therapy increased her pain, but eventually it relieved the soreness and pain in her neck and shoulder. Upon release by her physical therapist, she was given exercises to do at home and advised to use heat or ice whenever she experiences pain in those areas. Ms. Autin testified that she continues to experience pain in her neck and shoulder when there is a change in the weather. When that occurs, she applies heat and/or ice to the affected area to obtain relief.

The trial court's award was based in part on Ms. Autin's statements to Dr. Sonnier on November 1, 2000 that she was feeling better and doing housework. Her medical records establish that she felt better, but was not without pain, as of that date and thereafter. Dr. Sonnier's subsequent notes show that Ms. Autin continued to have neck pain, as well as pain in her ribs and elbow. She did not complete physical therapy until March 2001.

We agree with Ms. Autin that the trial court's award of $5,000.00 for her pain and suffering was abusively low and increase her award to $12,000.00.

Mr. Autin argues that the trial court's award of $6,000.00 for his loss of consortium claim should be increased to $10,000.00.

> Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual

14

relations, the right of performance of material services, the right of support, aid, and assistance, and felicity. The trier of fact is given much discretion in awards for loss of consortium and will not be overturned on appeal in the absence of manifest error.

*Creel v. St. Charles Gaming Co.*, 97-994, p. 11 (La.App. 3 Cir. 2/4/98), 707 So.2d 475, 481 (*quoting Bellard v. South Cent. Bell Tel. Co.*, 96-1426, p. 21 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 707) (citations omitted).

After the accident, Mr. Autin cooked, cleaned, drove Ms. Autin and Ms. Spears to doctor appointments, assisted them in whatever manner needed, and assisted in Kyle's care. Ms. Autin's mother assisted him, as did the Autins' other two daughters. Mr. Autin testified that he basically did everything around the house until February or March 2001 and that he continued to assist around the house until Ms. Autin was completely recuperated in the summer of 2001. He also testified that his and Ms. Autin's sexual relationship was affected for the same period of time.

The trial court awarded Mr. Autin $6,000.00 for his loss of consortium claim. While another trier of fact may have awarded a larger amount, we cannot say that the trial court's award is manifestly erroneous.

### *Ms. Spears*

Immediately after the accident, Ms. Spears felt pain in her right hand and shoulder. She had to be extricated from the car by the paramedics and was transported by ambulance to the hospital. After examining her right hand, the emergency room doctor called in Dr. Hugh Larriviere, an orthopedic surgeon, to treat her. Dr. Larriviere immediately performed surgery on Ms. Spears's right ring finger to realign the middle joint which had been fractured. During the surgery, he inserted a pin to stabilize the realigned bone. Ms. Spears also had a chip fragment where the tendon attaches to the last joint of her ring finger. The fragment was in close

15

proximity to a bundle of nerves on the bottom side of Ms. Spears's finger; it caused her pain, numbness, and tenderness, especially when touched. In March 2001, Dr. Larriviere performed a second surgery to remove the bone fragment, which alleviated the pain and discomfort it caused.

On April 24, 2001, Dr. Larriviere's examination of the finger showed that the incision from this second surgery was completely healed and that Ms. Spears had no pain to pressure over the bottom of the finger where the bone fragment had been. She could grasp his hand without pain. Dr. Larriviere testified that she still had a great deal of limitation with her range of motion in flexion and extension of her finger. On that date, she was no longer taking any pain medication and was sleeping all night. Dr. Larriviere thought she was doing well and told her to do whatever activities she could tolerate.

On August 30, 2001, Dr. Larriviere believed Ms. Spears had reached maximum medical improvement. He instructed her to continue exercising her finger at home twice a day and told her to use a night splint on her finger. He informed Ms. Spears that her finger might become more painful over time and if so, the finger could be fused in a bent position to allow her to hold things in her hand.

In July 2002, Dr. Larriviere performed a follow-up examination on Ms. Spears's finger. The finger had a good appearance, but its range of motion was reduced. She had a pretty good grip with the finger, and there was no hypersensitivity over the scar. Dr. Larriviere testified that she indicated to him that she had hardly any pain at all. He felt like she was becoming adapted to her bent finger and that she might not have to have it fused. Dr. Larriviere testified that, if she eventually requires a fusion, there is no guarantee the joint will fuse.

16

Dr. Larriviere retired, and Dr. Harold Granger became Ms. Spears's treating physician. Ms. Spears first saw Dr. Granger in early 2003. Dr. Granger testified that Ms. Spears continues to have pain in her ring finger, primarily in the middle joint, as well as pain and stiffness in her little finger and wrist. He also testified that she has problems with the top of her ring finger.

Dr. Granger discussed the possibility of a third surgery, a capsular release, to ease the pain in Ms. Spears's finger. However, he testified that he could not guarantee this surgery would relieve her pain and opined there was only a 50% chance it would improve her situation. He also indicated the surgery might actually worsen the tightness in her finger. Dr. Granger related that Ms. Spears had recently shown an interest in the surgery, but her interest in the surgery is greater than his.

Dr. Granger also discussed the possibility of a fusion to relieve the pain in Ms. Spears's finger. In Dr. Granger's opinion, this option is very undesirable, and he testified he would almost prefer amputating the finger through the middle joint to fusing the joint. He further testified that he would only recommend amputation if Ms. Spears's pain was severe and unrelenting. He did not testify that Ms. Spears's pain was of such magnitude.

The trial court awarded Ms. Spears future medical expenses in the amount of $1,000.00 for future office visits in light of her continuing complaints of pain in her finger and wrist. Ms. Spears argues she should have been awarded at least $11,000.00, which is the amount Dr. Granger estimated would be required for to perform a fusion on her finger.

17

In *Veazey v. State Farm Mutual Automobile Insurance Co.*, 587 So.2d 5, 8 (La.App. 3 Cir.1991) (citations omitted), this court addressed the proof required for an award of future medical expenses, explaining:

> Future medical expenses, like any other damages must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.

Dr. Granger discussed the possibility of future surgery but did not recommend surgery, and he was uncertain that any of the surgeries he discussed would benefit Ms. Spears. His testimony did not establish that Ms. Spears would more probably than not incur expenses for another surgery. Importantly, Ms. Spears testified that she would only "possibly" consider having additional surgery on her finger if the pain increased. The trial court did not err in awarding Ms. Spears $1,000.00 for future medical treatment.

Ms. Spears also argues that the trial court's refusal to award her past lost wages was error. Damages for past lost wages must be able to be calculated with mathematical certainty from the proof submitted at trial. Such an award is an exception to the much discretion award. *Sengsouly v. Allstate Ins. Co.*, 99-22 (La.App. 3 Cir. 6/9/99), 744 So.2d 649, *writ denied*, 99-2526 (La.11/19/99), 749 So.2d 677. "[T]he record must provide a factual basis for the award." *Myers v. Broussard*, 96-1634, p. 17 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 97.

The trial court concluded that Ms. Spears was voluntarily unemployed and did not award her past lost wages. In reaching this conclusion, the trial court observed that she was not working at the time of the accident, had not worked since the birth

18

of her son, who was four years old at the time of the accident, had allowed her driver's license to expire before the accident, did not renew her license after the accident, had not attempted to return to work after being released by her treating physician, and began home schooling her son after the accident and continued to do so at the time of the trial.

Ms. Spears and Ms. Autin testified that she did not return to work when Kyle started school in August 2000 because her younger sister was getting married in October and she was helping her mother plan and prepare for the wedding. Ms. Spears further testified that in 2002 she attempted to perform activities she would be expected to perform at a job, but she could not perform the activities for extended periods of time due to the pain the activities caused in her fingers and wrist.

In light of Ms. Spears's pre-accident work record and the fact that she home schooled her son after the accident through the time of the trial, we find no error with the trial court's refusal to award past lost wages.

Ms. Spears also urges that her award of $50,000.00 for general damages should be increased to $150,000.00. The City of Scott asserts that, when this award is considered together with the trial court's $15,000.00 award for disfigurement, it is sufficient.

Ms. Spears testified that she has pain everyday in her right ring finger, little finger, and her wrist. She rated her pain as ranging from three or four to ten on a scale of zero to ten. Dr. Granger testified that the development of pain in her little finger and wrist resulted from the modified use of her ring finger and hand due to her injury. He further testified that Ms. Spears may develop arthritis as a result of this injury.

19

Dr. Larriviere ordered physical therapy for Ms. Spears after her first surgery. He instructed her to take pain medication before her therapy sessions to reduce the pain that the therapy would induce. Ms. Spears testified that the therapy was very painful and that she would ask the therapist to stop, but he would not. After six months of physical therapy, Dr. Larriviere performed the surgery to remove the bone fragment in her finger. He testified that the surgery significantly relieved Ms. Spears's pain, but Ms. Spears testified that the surgery only helped the pain a "little bit."

Dr. Larriviere testified that the movement in Ms. Spears's ring finger was significantly reduced by her injury and that this type of injury is extremely hard to rehabilitate. He prescribed physical therapy after her first surgery to restore movement and function to her finger, but not after her second surgery. He testified that the physical therapist indicated in his notes that Ms. Spears did not do as much at home as she could have to improve the finger's range of motion. However, he further testified that he believed Ms. Spears had a low pain threshold and that the reduced range of motion he found in her finger during her July 2002 visit indicated to him that she was not doing the exercises he had recommended.

As stated above, Dr. Larriviere did testify that Ms. Spears has a low threshold for pain; however, he also testified that a lot of people fall into that category. None of the experts who worked with Ms. Spears indicated that she is a malingerer or is not interested in returning to work, as the trial court's reasons infer. Her physical therapist noted that she may not have been doing her home exercises as recommended; however, the fragment which caused her much pain was still in her

20

finger at that time and there is no indication the therapist had any knowledge of the fragment.

A defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. *Perniciaro v. Brinch*, 384 So.2d 392 (La.1980). Ms. Spears's low pain tolerance does not mitigate the City of Scott's liability for her damages.

We have reviewed the medical evidence and Ms. Spears's testimony regarding the pain she has suffered and continues to suffer as a result of her injury and the impact her injury has had on her and will continue to have on her in the future. We find the trial court's award for general damages is abusively low. We have reviewed awards for similar injuries and increase the award to $75,000.00.

Finally, Ms. Spears argues that the trial court's award for loss of earning capacity is abusively low. We agree. In *Batiste v. New Hampshire Insurance Co.*, 94-1467, p. 3 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied*, 95-1413 (La.9/22/95), 660 So.2d 472 (citation omitted), this court explained what earning capacity is and how it is calculated:

> [E]arning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.
>
> In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him

21

in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

In making its award of $24,000.00 for loss of earning capacity, the trial court observed that Ms. Spears's hand injury was permanent and decreased her future earning capacity. Continuing, the trial court explained its low award by referencing the testimony of two experts who testified on Ms. Spears's behalf. First, the trial court referenced the testimony of Manilal Gala, a physical therapist specializing in hand rehabilitation who performed a functional capacity evaluation on Ms. Spears over the course of two days. The trial court stated that Mr. Gala testified that "if someone was sufficiently motivated there's no reason why they couldn't become left hand dominant." However, Mr. Gala testified in response to a question by the trial judge that Ms. Spears could "[t]heoretically" learn to bowl with her left hand, stating "Theoretically, she can probably develop the skills with time if she practiced long enough to bowl with the left hand, but most of the time it's difficult for a right-hand dominant person to bowl with the left hand unless they practice." In response to further questioning by the trial judge, Mr. Gala clarified, "We generally . . . do not do . . . dominance transfer for the hobbies. We have trained people to dominance transfer. *There are exercises mainly for the writing purposes.*" Mr. Gala further testified, "There is enough information available. If a person practices and exercises enough with the left hand, you can develop the skills *to write* with the left hand."

The trial court next referenced the testimony of Stephanie Chalfin, a vocational rehabilitation expert, who tested Ms. Spears in order to determine her ability to return to the labor market. The trial court also questioned Ms. Chalfin regarding hand dominance transfer. She testified: "I've had other clients or patients who have the

22

same injuries to their dominant hands and they all found it very hard to switch dominance, that they started using their non-dominant hand more but they were never able to get it up to par. By that I mean, speed or coordination or anything like that." Ms. Chalfin reiterated Mr. Gala's testimony that dominance transfer is primarily for writing purposes. She further observed that for most people even writing with their non-dominant hand is very slow and very sloppy.

The trial court discounted Ms. Chalfin's testimony on this issue based on its conclusion that her testimony conflicted with Mr. Gala's testimony. Our review of these experts' testimony reveals that their opinions do not conflict and are actually similar. Accordingly, we find the trial court erroneously discounted Ms. Chalfin's testimony.

Ms. Spears testified that she wanted to return to work. She contacted Dr. Larriviere, and he told her she could try. She began trying to do things at home as if she were working, like typing and using a computer. She testified that after fifteen or twenty minutes of using her hand she had so much pain she would have to stop whatever activity she was doing and soak her hand in a paraffin bath to relieve the pain. She also testified that she attempted using splints prescribed by Dr. Larriviere to increase the range of motion in her finger, but they caused her finger to hurt so badly she often had to take them off immediately. Mr. Gala's evaluation confirmed her complaints of pain after using her right hand fifteen to twenty minutes and her need to rest her hand after use.

The trial court also concluded that Ms. Spears was not sufficiently motivated to endure pain to improve. We have previously discussed Ms. Spears's physical therapist's note that she was not doing everything she could to improve the range of

23

motion in her finger. Ms. Spears underwent physical therapy *before* Dr. Larriviere's removal of the fragment in her finger. As Dr. Larriviere testified, the fragment was in near proximity to a nerve bundle and caused Ms. Spears much pain and discomfort whenever it was touched. Nothing in the record indicates that Ms. Spears's physical therapist knew about the fragment or that it caused her pain upon touch. The therapist's comments that she did not try hard enough on her own must be considered in this light. Additionally, we observe that no formal physical therapy was ordered after the fragment was removed, even though Dr. Larriviere testified that this type of injury is extremely hard to rehabilitate. We believe this course of events placed Ms. Spears in an unfavorable light through no fault of her own. This is especially true when Dr. Larriviere's testimony that she has a low pain threshold is considered.

We find the trial court's award for Ms. Spears's loss of future earning capacity is based on a misinterpretation of expert testimony and unfair treatment of her because she has a low pain threshold and that the award is manifestly erroneous. Ms. Chalfin testified that Ms. Spears would have been able to earn $8.00 to $12.00 per hour if she had not been injured, that she will have to be selective in her employment due to the limitations to her right hand and, as a result of those limitations, she will be limited to earning $6.00 to $6.25 per hour. She concluded that her injury resulted in a loss of approximately $3.40 to $4.75 per hour loss of earning potential. Doug Womack, an economics expert, testified that Ms. Spears's loss of future earning capacity, based on her work life expectancy and discounted to today's value, is $125,518.00 ($3.40 per hour loss) to $175,356.00 ($4.75 per hour loss). We award Ms. Spears $125,518.00 for loss of future earning capacity.

24

## *Disposition*

The judgment of the trial court is reversed insofar as it assigns liability to Barbara Autin for the September 18, 2000 accident. The judgment of the trial court is amended to increase Barbara Autin's general damage award to $12,000.00 and to increase Tessica Spears's general damage award to $75,000.00 and her award for loss of future earning capacity to $125,518.00. The judgment is affirmed in all other respects. All costs are assessed to the City of Scott.

**REVERSED IN PART, AMENDED IN PART, AND RENDERED.**