# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 05-1618

JANE D. SORREL

VERSUS

ALLSTATE INSURANCE CO., ET AL.

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2001-3500
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***

**GLENN B. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Glenn B. Gremillion, and Elizabeth A. Pickett, Judges.

**AFFIRMED AS AMENDED.**

**Frank E. Barber**
**P. O. Box 9207**
**New Iberia, LA 70562-9207**
**(337) 364-3629**
**Counsel for Plaintiff/Appellant:**
    **Jane D. Sorrel**

**Mesonie T. Halley, Jr.**
**One Lakeshore Drive., #1710**
**Hibernia Bank Tower**
**Lake Charles, LA 70629**
**(337) 497-0039**
**Counsel for Defendant/Appellee:**
>    **Allstate Insurance Co.**
>    **Edward J. Cavalier**

**Stacy Skolfield Lee**
**400 E. Kaliste Saloom, Suite #8300**
**Lafayette, LA 70508**
**(337) 291-1743**
**Counsel for Defendant/Appellee:**
>    **Allstate Insurance Co.**
>    **Edward J. Cavalier**

GREMILLION, Judge.

The plaintiff, Jane Sorrel, appeals the trial court's judgment based on the jury's verdict, arguing that it awarded her insufficient general damages and erred in failing to award her damages for future medical expenses. For the following reasons, we affirm as amended.

## FACTS

This suit stems from an automobile accident which occurred when Sorrel's vehicle was rear-ended by a vehicle driven by the defendant, Edward Cavalier. The accident occurred on Pinhook Road in Lafayette, Louisiana. As a result of this accident, Sorrel sought medical treatment for various injuries, including an injury to her neck. She was treated by Dr. John Cobb, an orthopedic surgeon, who eventually recommended that she undergo neck surgery to address a degenerative disc at C5-6. At the time of trial, Sorrel, although desirous of having the procedure, had not yet undergone surgery.

Sorrel filed suit against Cavalier and his insurer, Allstate Insurance Company (referred to collectively as Cavalier), seeking damages for the injuries she suffered during the accident. Cavalier answered the petition and requested trial by jury. The matter proceeded to a jury trial, after which the jury reached a verdict finding that Cavalier was totally at fault in causing this accident. The jury awarded Sorrel $10,000 in general damages, $17,980.07 in past medical expenses, but nothing for future medical expenses. A judgment was rendered by the trial court based on the jury's verdict. Both Sorrel and Cavalier filed motions for JNOV; Sorrel sought additional damages and Cavalier sought to correct the award of past medical

1

expenses. The trial court denied Sorrel's motion, but granted Cavalier's motion by reducing the award of past medical expenses from $17,980.07 to $15,207.17. This appeal by Sorrel followed.

**ISSUES**

On appeal, Sorrel argues that the jury erred in awarding her only $10,000 in general damages and nothing for future medical expenses.

**STANDARD OF REVIEW**

General damages are speculative in nature and, thus, are incapable of being fixed with any mathematical certainty. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70. As they are speculative, a jury's award of such damages is reviewed in light of the standard set forth in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). First, we determine if the trial court's award for the particular injury and its effect under the particular circumstances on this plaintiff is a clear abuse of the jury's "much discretion." *Id.* at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Id.* at 1261.

Special damages are those damages which may be determined with some degree of certainty and include past and future medical expenses. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the

evidence. *Cormier v. Coston*, 05-507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541. The award of future medical expenses must be supported by testimony indicating both their need and probable cost. *Holliday v. United Servs. Auto. Ass'n*, 569 So.2d 143 (La.App. 1 Cir. 1990).

### General Damages

After the accident, Sorrel testified that she felt a big jolt and then felt woozy, as though her brain was shaking. She said that she experienced head, neck, and lower back pain and, eventually, neck spasms and headaches. She was treated briefly by her family doctor, Dr. Alberto Palmiano, and by a chiropractor, Dr. Adel Malakmeh. When her condition failed to improve, she was referred to Dr. Cobb, who recommended that she undergo neck surgery.

Sorrel testified that her lower back injury resolved a year after the accident. She explained that she had previously injured her lower back in 1995, as a result of a work-related injury, and had undergone a discectomy at L4-5. She said that she was unemployed as a result of this injury. After the present accident, she stated that her lower back ached and that she treated her condition with heat and pain medication.

With regard to her neck, Sorrel stated that her symptoms have never totally gone away, although she was able to resume most of her activities a year after the accident. She testified that her neck continues to feel stiff and painful and she suffers from headaches, especially when she uses her arms. Sorrel said that it hurts to bend over and brush her teeth; her neck becomes stiff if she looks down too long while reading, does not move her neck, or turns her head to the right while backing

3

her car. She said that she gets a headache when she tries to use her arms to trim her hedges.

As a result of her neck condition, Sorrel testified that she had to learn new hobbies and a new lifestyle. She stated that she had to hire someone to help her maintain her home. Prior to the accident, she kept her house up, mowed the grass, and trimmed the hedges. Afterwards, she stated that she was unable to do these things because of pain. Sorrel further testified that prior to the accident, she liked attending church functions, visiting friends, and decorating her home. Afterwards, she said that she was no longer able to do these things. She stated that she could no longer sew because sitting was painful. When her neck feels good, she states that she is able to relax, watch a movie, listen to music, and read without pain.

Sorrel testified that she had been involved in four previous accidents prior to the July 10, 2000 accident. She injured her lower back in the work-related accident in 1989, for which she underwent a discectomy at L4-5. She was injured in a bus accident, when the bus she was riding in was hit by a truck. She stated that she filed a lawsuit against the driver of the truck, but settled her claim with him. Sorrel said she was involved in another automobile accident in 1995, in which she suffered temporary injuries to her lower back and sought treatment from Dr. Cobb. Although Dr. Cobb's medical records state that she complained of neck pain after this accident, Sorrel stated that the pain was very temporary. She was also involved in an accident at a person's home in December 1995. She stated that she tripped and fell, breaking the radial tuberosity in her right shoulder, for which she underwent surgery.

4

Dr. Cobb testified that he first evaluated Sorrel on August 16, 2000, at which time she complained of frequent headaches and aching on the top of her skull, accompanied by vomiting and blurred vision. She also complained of neck pain, which was made worse by lifting, and pain from the back of her neck to her shoulders, with aching in both arms and wrists, the right worse along her little finger. Dr. Cobb indicated that Sorrel also complained of aching in her knees and right ankle, and stiffness in her neck, back, and fingers. She rated her pain as being an eight on a scale of ten.

Dr. Cobb described Sorrel's injury as an acceleration injury in which the head is thrown back and then forward. He stated that this results in an "S" shaped deformity when the neck is hyper-extended as it goes backward, the spine is then thrust upward into the back of the skull, and finally, the neck flexes forward. When the neck hyper-extends, Dr. Cobb stated that there is a distraction force on the front of the spine and a compression force on the back of the spine. This process is reversed when the neck flexes forwards. Thus, the spine's joints and ligaments are either being stretched or compressed depending on whether the neck is hyper-extending or flexing.

Dr. Cobb stated that x-rays and a November 10, 2000 MRI revealed that Sorrel was suffering from spondylosis at C5-6, as well as a small, mild, left-sided broad-based disc bulge at that level. He described spondylosis as an adaptive process that the spinal column goes through as a result of degenerating discs caused by aging. He stated that this eventually results in a narrowing of the neural foramina, the

5

formation of bone spurs, thickening of ligaments, and the calcification or hardening at the back of and an enlargement of the affected vertebrae.

Dr. Cobb felt that some of Sorrel's symptoms were related to her spondylosis, which had become symptomatic as a result of the July 10, 2000 accident. On January 22, 2001, he testified that he discussed the options available to her, which were injections, surgery, physical therapy, and the passage of time. At that time, he stated that she decided to give her neck condition time to resolve on its own. On July 16, 2001, he stated that she was still complaining of neck symptoms, so they again discussed her options of treatment. At that point, Dr. Cobb stated that Sorrel's condition was somewhat guarded, in that he did not feel that her neck condition would resolve itself anytime soon.

Sorrel returned to Dr. Cobb on June 3, 2002. He stated that she was still complaining of neck pain, as well as fairly significant occipital headaches. She also indicated having symptoms in her left arm and wrist. Dr. Cobb noted in his examination that her head was slightly shifted forward, which indicated a de-conditioning of the musculature in the back of the neck. He now felt that surgery was required in order to afford Sorrel permanent pain relief. A September 19, 2002 discogram confirmed that Sorrel's C5-6 disc abnormality was the cause of her pain. After this test, Dr. Cobb recommended that she undergo an anterior discectomy and fusion at C5-6. He stated that he last saw Sorrel on October 7, 2002, although he prescribed medication for her in December 2004.

Dr. Sorrel testified that he had previously treated Sorrel in 1989, for a lower back injury secondary to a lifting injury. He said that he next saw her in

6

September 1995, after she was involved in an automobile accident. At that time, he stated that she indicated she had undergone lower back surgery in 1990, by Dr. Llewellyn, a neurosurgeon in New Orleans. During follow-up for her 1995 injury, Dr. Cobb testified that Sorrel told him that she was experiencing neck pain and headaches. As she was being treated for these symptoms by Dr. Hurst, a neurosurgeon, he stated that he did not inquire further into the cause or the condition of her neck. Dr. Cobb stated that he last treated Sorrel in 1995 and 1996, after she tripped and suffered a non-displaced fracture of the radial tuberosity in her right shoulder in December 1995.

Dr. Joe Morgan, an orthopedic surgeon, examined Sorrel at the request of Allstate on September 29, 2004. At the examination, he stated that she complained of intermittent neck pain and headaches, especially when she turned her head to the right. She further complained of intermittent numbness in her hands, when sitting; intermittent weakness in her arms, when trying to work; and daily swelling in her legs and ankles. She reported that her neck pain was worse if she was up for awhile and that she had trouble driving because it hurt to turn her neck. In examining Sorrel, Dr. Morgan noted tenderness at the extremes of extension and rotation bilaterally in her cervical spine, which he considered objective signs. He also stated that she had full range of motion in her neck. He testified that x-rays revealed mild spurring anteriorly and posteriorly, with disc space narrowing at C5-6. He further found the results of a grip test administered in his office to be invalid, as her results failed to form a bell-shaped curve and he found her values too low for someone exhibiting her muscle mass and a full range of motion in her upper extremities.

7

Dr. Morgan opined that Sorrel had probably sustained a cervical strain, which was superimposed onto a preexisting cervical spondylosis. He further felt that she had sustained a lumbar strain, which was superimposed upon a prior lumbar laminectomy and discectomy at L4-5, arthritis of the lumbar spine, a protrusion at L5-S1, and a bulging at L4-5. He felt that the cervical and lumbar strains by themselves should only take a couple of months to resolve, but superimposed over the named preexisting conditions, should take approximately four months to resolve.

Dr. Morgan further opined that no surgery was required for Sorrel's cervical spine as a result of the July 10, 2000 accident. He stated that she might require a cervical fusion at C5-6 based on her preexisting condition, but doubted whether this was necessary based on the long periods of time between her appointments with Dr. Cobb. He found this to be atypical of a person suffering from a neck condition requiring surgery. Dr. Morgan testified that he found no objective signs of the need for surgery in his examination of Sorrel. He said that her brachioradialis reflexes were present and that there was no atrophy or localized weakness in either upper extremity, which would indicate a nerve root problem in her cervical spine. Although he would assign Sorrel a physical impairment rating, he stated that this was based solely on her preexisting lower back condition. Dr. Morgan further opined that no limitations should be placed on Sorrel as a result of this accident, as he found no objective weakness in her upper extremities, despite her weakness in the grip testing. With regard to her headaches, he suggested that a neurologist should address this problem. Finally, he felt that Sorrel required no pain

8

medication as a result the accident, but stated that she might require such medications based on her preexisting condition.

Although Sorrel may have suffered from a preexisting cervical spondylosis, as acknowledged by both Drs. Cobb and Morgan, it is axiomatic that a defendant takes his plaintiff as he finds her. "A defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant." *Spears v. City of Scott*, 05-230, p. 21 (La.App. 3 Cir. 11/2/05), 915 So.2d 983, 997. Here, there is no evidence, other than a brief mention that Sorrel complained of neck pain in 1996, that her spondylosis was symptomatic prior to the July 10, 2000 accident. However, the evidence proves that it became symptomatic following the accident. After reviewing the medical evidence and Sorrel's testimony with regard to the pain she suffered and continues to suffer as a result of this accident, we find that the jury's award of $10,000 is abusively low. Considering the facts of this case, we find that the lowest amount that the jury could reasonably have awarded is $40,000. *Coco v. Winston Indus. Inc.*, 341 So.2d 335 (La.1976).

### *Future Special Damages*

The jury awarded Sorrel nothing for future special damages despite testimony from her that Dr. Cobb recommended that she undergo an anterior discectomy and fusion at C5-6. Although she had not yet undergone the procedure, Sorrel testified that she now wants to have the surgery so that she can experience a better quality of life, move her neck freely, and be in less pain. She stated that she wants to be able to do all of the things which her pain prevents her from doing, such

9

as driving her car on a trip, trimming her hedges, sewing, and increasing her hobbies. She said that she held off from having the surgery because she was scared and because she could not afford it. She further thought that her condition would improve over time and with the use of medication. However, she said that it has not done so.

Dr. Cobb described Sorrel's condition as being somewhat guarded; he did not feel that her condition would spontaneously resolve in the near future. Based on her condition, he recommended that she undergo an anterior discectomy and fusion at C5-6. However, he agreed that surgery was one option available to Sorrel, in that she could choose to continue as she had done for the last couple of years by trying to manage her pain conservatively. He stated that for patients with chronic pain, the issue becomes one of lifestyle. Either they choose to have surgery, or they modify their lifestyle, despite suffering from significant pain, to try and control their pain. In this instance, Dr. Cobb stated that Sorrel's condition was not life threatening and that she could live without the surgery.

Dr. Cobb described the surgery as being a major procedure, requiring an overnight stay in the hospital and then six months of follow-up care. He estimated that the surgery alone would cost $20,000, the hospital stay would cost $15,000, and the bone graft or plate would cost $6000.

Although the jury awarded Sorrel past medical expenses, it awarded her nothing for future medical expenses. The burden was on Sorrel to prove her entitlement to such damages by a preponderance of the evidence. In this instance, the jury heard testimony that her chronic pain could be treated by the surgery recommended by Dr. Cobb, which she now desires to undergo. However, there was

further testimony that Sorrel could try to manage her pain conservatively by altering her lifestyle. As Sorrel has waited two-and-a-half years before choosing this option, it was reasonable for the jury to find that she had chosen to treat her condition conservatively. Although she stated that she was scared of undergoing surgery, the record revealed that she previously underwent two surgeries with good results. Accordingly, we find no error in the jury's finding that Sorrel is not entitled to an award for future medical expenses.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is amended to increase the general damages awarded to the plaintiff-appellant, Jane Sorrel, from $10,000 to $40,000. The judgment is affirmed in all other respects. The costs of this appeal are assessed to the defendants-appellees, Edward Cavalier and Allstate Insurance Company.

**AFFIRMED AS AMENDED.**